[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 579 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 580 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 581 
The Jefferson County grand jury returned an indictment charging the appellant, Demetrius Terrence Frazier, with three counts of capital murder. Count I charged the appellant with the offense of murder made capital because it occurred during a robbery. See § 13A-5-40(a)(2), Code of Alabama 1975. Count II charged the appellant with the offense of murder made capital because it occurred during a burglary. See § 13A-5-40(a)(4), Code of Alabama 1975. Count III charged the appellant with the offense of murder made *Page 582 
capital because it occurred during a rape. See § 13A-5-40(a)(3), Code of Alabama 1975. The jury found the appellant guilty of capital murder as charged in Count I of the indictment, and guilty of intentional murder, as a lesser offense to the capital murder charge in Count III of the indictment. The trial court declared a mistrial on Count II of the indictment because the jury was unable to reach a verdict on that count.
As to the appellant's capital murder conviction under Count I, the jury, by a vote of 10 to 2, recommended that the appellant be sentenced to death. The trial court followed the jury's recommendation and sentenced the appellant to death by electrocution. With regard to the appellant's conviction for the lesser offense of murder under Count III of the indictment, the trial court sentenced the appellant to life imprisonment.
The trial court, in its written sentencing order imposing the death penalty, set out the following facts:
 "During the early morning of November 27, 1991, the defendant saw a light on in Pauline Brown's ground floor apartment. He removed a screen and entered through the window.
 "In searching the apartment, he found $5 or $10 in a bedroom. Ms. Brown, who was asleep in her bedroom, was awakened by the defendant, who was armed, to demand more money. She gave him $80 out of her purse. After forcing her at gunpoint to have sexual intercourse from the rear, she begged him not to kill her. He then put the pistol to her head and shot.
 "The defendant then left the apartment to see if anyone [had] heard the shot and, satisfied they had not, returned to the apartment to search for more money and to make sure she was dead. He went to her kitchen and ate some bananas and left the apartment. The pistol was thrown in a ditch.
 "Ms. Brown died as a result of the gunshot to the back of her head."
(Supp. Rec., C.R. 12.)
We note that many of the appellant's assertions were not preserved for appellate review; nevertheless, because this case involves the death penalty, we must review the appellant's assertions for plain error.
 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
Rule 45A, Ala.R.App.P.
 "In considering what constitutes plain error in a capital case, we have adhered to the interpretation of the term `plain error' adopted by the Alabama Supreme Court, which follows the interpretation given that term by the federal courts. See Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985); Ex parte Womack, 435 So.2d 766 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367
(1983). See also Hooks v. State, 534 So.2d 329
(Ala.Cr.App. 1987), aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989). Plain error is error that has or probably has adversely affected a substantial right of the appellant, Ala.R.App.P. 45A, or is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Womack. The failure to object at trial weighs against any claim of prejudice an appellant may make. Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala. 1991)."
Bush v. State, 695 So.2d 70, 87 (Ala.Cr.App. 1995), aff'd,695 So.2d 138 (Ala. 1997), cert. denied, 522 U.S. 969,118 S.Ct. 418, *Page 583 139 L.Ed.2d 320 (1997). See also Davis v. State, 718 So.2d 1148,1154 n. 3 (Ala.Cr.App. 1997), aff'd, 718 So.2d 1166 (Ala. 1998).
 I.
Although the issue was not raised by the appellant at trial or on appeal, this Court is required, under the plain error doctrine, to address whether the trial court had jurisdiction to adjudge the appellant both guilty of capital murder for the robbery-murder of Pauline Brown as charged in Count I of the indictment, and guilty of the intentional murder of Pauline Brown, as a lesser offense to the capital murder charged in Count III of the indictment. Based upon this Court's rationale in Borden v. State, 711 So.2d 498, 503-04 (Ala.Cr.App. 1997), aff'd, 711 So.2d 506 (Ala.), cert. denied, 525 U.S. 845,119 S.Ct. 113, 142 L.Ed.2d 91 (1998), and in Mangione v. State,740 So.2d 444 (Ala.Cr.App. 1998), we hold that the trial court could not adjudge the appellant guilty of both capital murder under Count I of the indictment and the lesser-included offense of intentional murder under Count III.
We quote extensively from our opinion in Mangione:
 "Section 13A-1-8, Ala. Code 1975, provides, in relevant part:
 "`(b) When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if:
 "`(1) One offense is included in the other, as defined in Section 13A-1-9 . . . .'
 "(Emphasis added [in Mangione].) Section 13A-1-9, Ala. Code 1975, provides that an offense is included in another offense if `[i]t is established by proof of the same or fewer than all the facts required to establish the commission of the offense charged.' Intentional murder, as defined in § 13A-6-2(a)(1), Ala. Code 1975, is a statutory element of the capital offense of murder committed during a kidnapping, as that offense is defined in § 13A-5-40(a)(1), Ala. Code 1975; therefore, the state must prove the element of intentional murder to support a conviction for the capital offense of murder committed during a kidnapping. Thus, intentional murder is a lesser-included offense of the capital offense of murder committed during a kidnapping. Here, the intentional murder of [the victim] was a lesser-included offense of both the capital offense of murder committed during a kidnapping, as charged in Count I of the indictment, and the capital offense of murder committed during the course of a robbery, as charged in Count II of the indictment.
 "`We recognize that the trial court may, and indeed should, properly submit to the jury all counts of an indictment and lesser included offenses reasonably supported by the evidence, notwithstanding the fact that some of the lesser included offenses constitute the "same offense" for double jeopardy purposes. Rolling [v. State], 673 So.2d [812] at 815 n. 1 [(Ala.Cr.App. 1995)], citing Ball v. United States, 470 U.S. 856, 865, 105 S.Ct. 1668, 1673-74, 84 L.Ed.2d 740 (1985), and King v. State, 574 So.2d 921, 935-36 (Ala.Cr.App. 1990)(Bowen, J., concurring specially). However, where, as here, the jury returns guilty verdicts for both a capital offense alleged in one count of the indictment and the lesser included offense of intentional murder of a capital offense alleged in another count of the indictment, and the same murder was an element of the capital offense and the intentional murder conviction, the trial court should enter a judgment on only one of the offenses.'
 "Borden v. State, 711 So.2d 498, 503 (Ala.Cr.App. 1997), aff'd, 711 So.2d 506 (Ala. 1998). While the appellant was properly charged with the two capital *Page 584 
 offenses, see Borden, 711 So.2d at 503-04 n. 3, and both offenses were properly submitted to the jury, the prohibition against double jeopardy was violated when the appellant was convicted of the capital offense of murder during the course of a kidnapping under Count I of the indictment and also convicted of the lesser-included offense of intentional murder under Count II of the indictment, because the `same murder was an element of the capital offense and the intentional murder conviction.' Borden, 711 So.2d at 503. See also Coral v. State, 628 So.2d 954, 958 (Ala.Cr.App. 1992), aff'd, 628 So.2d 1004 (Ala. 1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994) (holding that the defendant's conviction of the lesser-included offense of intentional murder under a count alleging the capital offense of murder-robbery and his conviction of the capital offense of murder-burglary violated the principles of double jeopardy where the same murder was an element of both convictions). Accordingly, this cause is remanded for the trial court to vacate the appellant's conviction for intentional murder, as a lesser-included offense of the capital offense of murder during a robbery, as charged in Count II of the indictment."
740 So.2d at 449. (Some emphasis original; some emphasis added.)
In the present case, as in Mangione,
 "the prohibition against double jeopardy was violated when the appellant was convicted of the capital offense of murder during the course of a [robbery] under Count I of the indictment and also convicted of the lesser-included offense of intentional murder under [Count III] of the indictment, because the `same murder was an element of the capital offense and the intentional murder conviction.' Borden v. State, 711 So.2d [at] 503."
740 So.2d at 449. Accordingly, this cause is remanded for the trial court to vacate the appellant's conviction for intentional murder, as charged in Count III of the indictment, as a lesser-included offense of the capital offense of murder during a rape.
 II.
The appellant maintains that "[t]he trial court committed reversible error by denying the defense's motion for a pretrial mental examination of the appellant where both his competency to stand trial, and his sanity at the time of the offense were seriously in question." (Appellant's brief, p. 5.) Although the appellant claims that both his sanity at the time of the offense and his competency to stand trial were in question, the thrust of his argument on appeal addresses his competency to stand trial.
The appellant's sanity at the time of the offense and his competency to stand trial are two distinct issues, and are governed by different legal standards. See Committee Comments to Rule 11.1, Ala.R.Crim.P. The defense of mental disease or defect is codified at § 13A-3-1, Code of Alabama 1975, which provides:
 "(a) It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.
 "(b) `Severe mental disease or defect' does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.
 "(c) The defendant has the burden of proving the defense of insanity by clear and convincing evidence."
(Emphasis added.)
 "The United States Supreme Court has held that `when the defendant is able to make an ex parte threshold showing to the trial court that his sanity is likely to be a significant factor in his defense, he is entitled to psychiatric assistance *Page 585 
 at trial.' Ake v. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1985)."
Fox v. State, 602 So.2d 484, 486 (Ala.Cr.App. 1992). However,
 "A criminal defendant does not have a right to a mental examination merely because he requests one. Blevins v. State, 516 So.2d 914, 915 (Ala.Cr.App. 1987); Marlow v. State, 538 So.2d 804, 807 (Ala.Cr.App. 1988). Nor does the fact that an accused is indigent automatically entitle him to a free psychiatric evaluation. Nelson v. State, 405 So.2d 392, 394
(Ala.Cr.App. 1980), reversed on other grounds, 405 So.2d 401 (Ala. 1980); Bailey v. State, 421 So.2d 1364, 1367
(Ala.Cr.App. 1982). An indigent defendant will be entitled to state-funded psychiatric assistance only after he has made a preliminary showing that his sanity at the time of the offense is questionable. Holmes v. State, 497 So.2d 1149, 1151 (Ala.Cr.App. 1986); Sabiar v. State, 526 So.2d 661, 663 (Ala.Cr.App. 1988)."
Stewart v. State, 562 So.2d 1365, 1368 (Ala.Cr.App. 1989).
A defendant's "`competency to stand trial refers to a defendant's current mental state and functional capacities as they relate to a pending trial process.'" Committee Comments on Rule 11.1, quoting T. Grisso, Evaluating Competencies.
 "`Ala. Code 1975, § 15-16-21, provides in pertinent part:
 "`"If any person charged with any felony is held in confinement under indictment and the trial court shall have reasonable ground to doubt his sanity, the trial of such person for such offense shall be suspended until the jury shall inquire into the fact of such sanity . . . ."[1]
 "`This section authorizes the trial court to make a preliminary determination (without the aid of a jury) as to whether there are reasonable grounds to doubt the defendant's competency to stand trial. Ex parte LaFlore, 445 So.2d 932, 934 (Ala. 1983); Richardson v. State, 354 So.2d 1193, 1196 (Ala.Cr.App. 1978). The trial court is, thus, the "screening agent" for mental examination requests. Livingston v. State, 419 So.2d 270, 274 (Ala.Cr.App. 1982).'
 "Reese v. State, 549 So.2d 148, 150 (Ala.Cr.App. 1989), overruled on other grounds, Huntley v. State, 627 So.2d 1013 (Ala. 1992). `It is left to the discretion of the trial court as to whether there is a reasonable or bona fide doubt as to sanity and, thus, whether a further examination is required.' Waldrop v. State, 459 So.2d 953, 955 (Ala.Cr.App. 1983), aff'd, 459 So.2d 959
(Ala. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985). The standard of review is whether the trial court abused its discretion by not requiring an evaluation of Russell's competency to stand trial. See Baker v. State, 599 So.2d 60, 62 (Ala.Cr.App. 1991).
 "A trial of an accused who is incompetent violates due process. Wagner v. State, 489 So.2d 623, 628 (Ala.Cr.App. 1985); Bishop v. United States, 350 U.S. 961, 76 S.Ct. 440, 100 L. Ed. 835 (1956). Rule 11.1, Ala.R.Crim.P., states: *Page 586 
 "`A defendant is mentally incompetent to stand trial or to be sentenced for an offense if that defendant lacks sufficient present ability to assist in his or her defense by consulting with counsel with a reasonable degree of rational understanding of the facts and the legal proceedings against the defendant.'
 "The trial court makes the ultimate determination of a defendant's competency pursuant to the following standard:
 "`The test for determining competency to stand trial is whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960); Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975).'
 "Anderson v. State, 510 So.2d 578, 579 (Ala.Cr.App. 1987). This determination [of competency to stand trial] should be left to the discretion of the trial court.' Baker v. City of Huntsville, 516 So.2d 927, 931 (Ala.Cr.App. 1987)."
Russell v. State, 715 So.2d 866, 868-69 (Ala.Cr.App. 1997). (Emphasis added.)
On December 4, 1995, the appellant was arraigned on three counts of capital murder. He pleaded not guilty, but he did not enter a plea of not guilty by reason of insanity.
On March 15, 1996, the defense filed a motion for a court-ordered mental examination to determine the appellant's competency to stand trial and to determine the appellant's mental condition at the time of the offense. In support of its motion, the defense argued:
 "1. The Defendant is charged in Jefferson County, Alabama, with capital murder;
 "2. That the undersigned attorneys were appointed as counsel and cocounsel by the Honorable Michael McCormick, after the Defendant was found indigent.
 "3. The Defendant is without funds to afford an independent psychological evaluation.
 "4. The Defendant, over the past several years has had several incidents during which time the Defendant exhibited uncontrollable violent behavior which was not in keeping with the history of the Defendant and which may indicate the onset of some mental disease or disorder;
 "5. The Defendant has become very difficult to communicate with and assisting counsel in preparing for his defense appears limited."
(C.R. 60-61.)
During a pre-trial motion hearing, the following exchange took place:
 "THE COURT: All right. I have a motion for the Court to order a mental examination of the defendant. This case is set for trial on June 3. What is the basis for this motion, Mr. Neumann?
 "MR. NEUMANN [defense counsel]: Your Honor, Mr. Street, who had filed the motions, called me this morning and was extremely ill and had to go to the doctor. He was scheduled — he was supposed to be handling the motions. And I did not get a chance to discuss that aspect with him or what has taken place on it. So I'm not prepared to give the Court an answer at this time.
 "THE COURT: Has the defendant to your knowledge had any history of mental illness or disease or defect?
 "MR. NEUMANN: To our knowledge the only information we have is what is alleged in the petition itself, Your Honor, with regard to past problems with regard to court proceedings and so forth. I believe it's alluded to in the petition itself.
 "THE COURT: Well, I'm going to deny it at this point. If you get any *Page 587 
 further information that's relevant to that issue, I need to know as soon as possible.
"MR. NEUMANN: Yes, sir."
(R. 2-4.)
The appellant's pre-trial motion requesting a mental examination was very general, and there was no other evidence before the trial court at the time the motion was entertained that warranted an investigation into the appellant's sanity at the time of the offense or his competency to stand trial.
 "`In the absence of any evidence, the mere allegations by counsel that the defendant is incompetent to stand trial do not establish reasonable grounds to doubt the defendant's sanity and warrant an inquiry into his competency. Whorton v. State, 422 So.2d 812 (Ala.Cr.App. 1982).`"
 "Cliff, [v. State], 518 So.2d [786] at 791 [(Ala.Cr.App. 1987)]."
Tankersley v. State, 724 So.2d 557, 565 (Ala.Cr.App. 1998). See also Woodall v. State, 730 So.2d 652 (Ala.Cr.App. 1997), aff'd in part, reversed in part on other grounds, 730 So.2d 652 (Ala. 1998) (quoting Nelson v. State, 511 So.2d 225, 238 (Ala.Cr.App. 1986), aff'd, 511 So.2d 248 (Ala. 1987), cert. denied, 486 U.S. 1017,108 S.Ct. 1755, 100 L.Ed.2d 217 (1988)) ("`[m]ere allegations by counsel that the accused is incompetent to stand trial or was insane at the time of the commission of the offense do not establish reasonable grounds to doubt a defendant's sanity which would warrant an inquiry into his competency.'") Accordingly, due to the lack of evidence before the trial court, we find no abuse of discretion in the trial court's denial of the appellant's pre-trial motion for a mental examination.
The appellant suggests that because of his behavior at trial, the trial court, sua sponte, should have ordered a mental evaluation for the purpose of determining his competency to stand trial. We disagree.
On the second day of the trial, before the opening arguments of counsel, defense counsel informed the trial court that the appellant was unwilling to wear a leg brace during the trial. The following exchange then occurred, outside the presence of the jury:
 "THE COURT: For purposes of the record, the Defendant has a history of violent behavior in another jurisdiction in the courtroom and, on at least one occasion, attacked a prosecuting authority in the courtroom.
 "Hence, it's the Court's opinion that, given his history of violent behavior in the courtroom, which has been supported by not only a newspaper report, but also officers who are involved in that jurisdiction, and that the Court [has] attempted to order the Defendant to wear a knee brace, which is designed to be concealed under the pants and it merely prohibits the Defendant from moving quickly from one area to another to hinder any violent acts or movements or quick movements on his behalf during the trial of this case. The Court has attempted to do this in a manner that would not be prejudicial to the Defendant in that this device is concealed and the jurors would not have any indication at all that he was being shackled or restrained in any way.
 "It's my understanding, Mr. Street [defense counsel], that he refuses to wear the knee brace and insists on being shackled or handcuffed; is that correct?
"MR. STREET: That's what he said.
 "THE COURT: Well, let's go ahead and put shackles on him and bring him up and we'll go on the record with this.
". . . .
 "THE COURT: Good morning, Mr. Frazier. It's been reported to the Court — of course, the Court was aware of this yesterday — that you have a history of violent and disruptive behavior in the courtroom. And that's been reported by officers of the court, as well as *Page 588 
 news media from Michigan, where you were tried before for other offenses.
 "And we don't want to sit here all week worrying about whether there's going to be some disruption in this courtroom that would jeopardize your safety, as well as [the] safety of the other people in the courtroom. And I've attempted to restrain you by using a leg brace, which the jurors couldn't see and would be reasonably comfortable to you, and it's my understanding that you refuse to wear that; is that correct?
"THE DEFENDANT: (No audible response).
"THE COURT: Sir?
"THE DEFENDANT: (No audible response).
 "THE COURT: Are you going to answer me, Mr. Frazier?
"THE DEFENDANT: (No audible response).
 "THE COURT: Do you have any response at all to what I'm saying?
"THE DEFENDANT: (No audible response).
 "THE COURT: Well, I'm going to give you a choice, you can either wear the leg brace or you can wear the shackles and the handcuffs. Obviously sitting there with shackles and handcuffs is not going to impress the jury very much; in fact, it would prejudice your case. I don't want to do that. In fact, I have never done that in the 15 years I've been on the bench. And most people understand that it hurts their case to do that, [and it is] an unreasonable position to take. Do you have anything to say?
"THE DEFENDANT: (No audible response).
"THE COURT: Mr. Frazier?
"THE DEFENDANT: (No audible response).
 "THE COURT: Are you going to sit there like that during the trial?
"THE DEFENDANT: (No audible response).
 "THE COURT: I understand you refuse to dress as well; is that correct?
"THE DEFENDANT: (No audible response).
 "THE COURT: You're not going to respond at all to the Court?
"THE DEFENDANT: (No audible response).
"THE COURT: Do you want to talk to him a minute?
"THE DEFENDANT: (Conferring with counsel).
 "MR. STREET: Your Honor, I've advised Mr. Frazier of the prejudicial effect of the ankle shackle and the handcuffs and how the leg brace would work, would not be seen by the jury, he would be allowed in casual clothes. He chooses not to respond to me either.
 "THE COURT: Well, Mr. Frazier, this is an important proceeding, and it's a matter of life and death in your case. It's not a time to be stubborn. You need to think about what you're doing. Do you have any response at all to the Court? And what I'm doing is for your benefit.
 "THE DEFENDANT: Okay. Don't make me no difference, go on with y'all, do what you got to do.
"THE COURT: Sir?
 "THE DEFENDANT: I say go on and do what you got to do. I don't care, don't make me no difference. I don't even want to be in the courtroom for my hearing.
 "THE COURT: Well, you understand that would hurt your case, you're not —
 "THE DEFENDANT: I don't care, I don't care. I don't want to be in the courtroom, period.
 "THE COURT: Well, let's proceed. Do y'all want to try to talk to him any more?
 "MR. NEUMANN: Could we have one more chance to talk to him, just —
 "THE DEFENDANT: I don't want to talk to you, I don't want to talk. *Page 589 
"MR. STREET: Just listen to me, just listen to —
"THE DEFENDANT: I don't want to talk, period.
"MR. STREET: Just listen to me.
 "THE DEFENDANT: I don't want to talk to you. I don't want to be in the courtroom, either.
"THE COURT: Sir?
 "THE DEFENDANT: I don't want to be in the courtroom either.
". . . .
 "THE DEFENDANT: I want to be placed in the, placed in the hole over there at county jail.
"THE COURT: Sir?
 "THE DEFENDANT: I say I want to be placed in the hole at county jail.
"THE COURT: Why would you want to do that?
 "THE DEFENDANT: Because I need to be placed in the hole for real.
"THE COURT: Why do you say that?
 "THE DEFENDANT: Because I'm telling you, I need to be placed in the hole.
 "THE COURT: You don't want to attend this proceeding?
 "THE DEFENDANT: No. I don't trust my lawyers. Plus I got a all mother-fucking white jury. I don't — I got 10 white jurors and 4 black jurors. I don't even want to sit in trial with them. I don't trust that jury. I don't trust the lawyers, either. I think them with the other prosecutors.
 "THE COURT: Well, do you understand you would be making a big mistake by not attending your own trial?
 "THE DEFENDANT: I'm just telling you about, I'm just telling you about — I don't want, I don't want — the lawyers back there, I don't trust them two lawyers back there. They lied to me. And I don't trust that jury. That jury, I got 10 white jurors up there and 4 black jurors up there. And I don't see I'm going to get a fair trial with them white jurors up there with you. We in Birmingham right now. This city majority, this city right here majority black, and I got 10 mother-fucking white jurors, a white jury.
 "THE COURT: Well, in my opinion what you're saying is not true, Mr. Frazier. And I've been trying cases a long time, and jurors, whether white or black, try to do a conscientious job. I'm sorry you feel that way. But do you want to attend your trial?
"THE DEFENDANT: I said, `no.'"
(R. 175-83.)
A discussion then took place between counsel and the court regarding whether the appellant could waive his presence at his trial. The trial court concluded that the appellant could not waive his presence at the trial, and it instructed the appellant to wear the leg brace and to dress appropriately so as not to prejudice his case. The following then occurred:
"THE DEFENDANT: Take me over there, I'll put it on.
"THE COURT: Sir.
 "THE DEFENDANT: Take me over there, I'll put it on.
"THE COURT: All right. Take him back over there.
 "MR. STREET: Your Honor, at this time, because of previous statements made by Mr. Frazier concerning his attorneys and the lack of trust, we're going to move for a mistrial and ask to be allowed to be excused from this case. And the second part of that motion is that Mr. Frazier, against our recommendations, wishes to say something to this court.
"THE COURT: Go ahead, Mr. Frazier.
 "THE DEFENDANT: Like I said before, I said I don't trust these two attorneys. Like I said, I think they're two undercover prosecutors, like I said before. I don't trust, I don't think they really trying to help me, and I don't *Page 590 
 think they be really trying to defend my case because they never came to see me.
 "They only came to see me starting first since Friday or Thursday for a trial. Been a whole year, I been down here a whole year, they come see me three times for a trial. And I think they working with the prosecutors, and I think they undercover prosecutors, myself.
 "And I don't like that jury they picked. They picked 10 white jurors and 4 black jurors. I don't see why y'all couldn't have picked out more black people to fit in that jury. The city, there's a lot of blacks in this city. Ain't enough black males in there, and almost all white jurors in that jury, and I don't trust that jury. I think that a jury, they elaborate [sic] with the government, the jury, got it theirself and I don't like that. And plus, I said before, like I said before, put me in a hole when I get — before you go back over there. I want to be put in the hole, seriously.
"THE COURT: Why do you want to be put in the hole?
 "THE DEFENDANT: I want to be put in the hole before I do something going to have me in there.
 "THE COURT: Before you do something to go down in there?
 "THE DEFENDANT: I need to be put in the hole, seriously.
 "THE COURT: Why, are you saying that you don't think you could behave —
 "THE DEFENDANT: Because right now I'm mad, I'm real mad right now, I'm real mad. There ain't no telling what I might do when I get back —
"THE COURT: Well —
 "THE DEFENDANT: I'm giving you a warning, I'm just letting you know. Like I say, I'm really mad right now. I might slap the shit out of my lawyer right there.
"THE COURT: You might what?
 "THE DEFENDANT: I might slap the shit out of my lawyer right here. Like I said, they going to put me in the hole when I get back over there.
 "THE COURT: Well, we'll take up the first matter you mentioned first. First place, I've known both counsel for many years.
"THE DEFENDANT: I don't care what you know about —
 "THE COURT: And regardless of your feelings, they certainly wouldn't be in collusion with the prosecution in this case.
"THE DEFENDANT: Why would I believe you?
". . . .
 "THE COURT: Well, I don't care whether you believe me or not.
 "THE DEFENDANT: Why you telling me? I don't want to hear it, I —
 "THE COURT: I just want you to know that, and I want the record to show that.
"THE DEFENDANT: I don't want to hear it.
 "THE COURT: All right. We're going to proceed with this case. It will be up to you to behave.
 "THE DEFENDANT:: Why you forcing me to go with these two lawyers right here? They, they — I've been here for almost eight months, they only came to see me three times. I got a capital murder case.
 "THE COURT: Mr. Street, Mr. Neumann, do you want to respond to his allegations?
 "MR. NEUMANN: Your Honor, with regard to the case and so forth, and what we know about it, we feel like we have adequately prepared for the case. We have also discussed all the facts and details of the case. And you know, it's a quite common occurrence that most people that are in jail feel like that attorneys have to come over to talk to them at least once or twice a week, which is not necessary. *Page 591 
 "As I said, Mr. Street and I have spent many hours discussing this case, going over the evidence and so forth. You know, it's just a matter of opinion, Judge, but we feel like that we've done an adequate job in preparing for the defense, considering all the facets of the case, as we know about it, and so forth.
 "THE DEFENDANT: One more thing I need to say, Your Honor: Before we got started the jury trial, started picking the jury, you had told, Your Honor had told the jury, you and the lawyers and prosecutors told the jury that I was pleading innocent in this case. You said the Defendant is pleading innocent to the case. I ain't innocent to the case, you already know I'm guilty, so I don't like how y'all told the jury that I'm pleading innocent to the case when I'm not pleading innocent to the case, I'm pleading guilty to the case.
 "Y'all lied to the jury, put a false illusion, put false ideas in their mind. Tell them that I'm pleading innocent and they going to hear the tape and stuff, say that why is the man pleading innocent when he made a statement? So y'all told the jury I'm pleading innocent. I ain't pleading innocent, I'm pleading guilty.
 "THE COURT: Well, for the record, you've pled not guilty, and that's the reason we're —
"THE DEFENDANT: I didn't plead no not guilty.
"THE COURT: That's the reason we're having a trial.
"THE DEFENDANT: I'm pleading, I'm pleading guilty.
 "THE COURT: Well, have you discussed that with your counsel?
"THE DEFENDANT: They know that.
 "MR. STREET: Your Honor, we have discussed with Mr. Brown the possibility, offer of life without parole, and Mr. Brown would not make that offer. I advised Mr. Frazier of that, myself, because you —
". . . .
 "MR. STREET: — do not plead guilty to the death penalty, because they were seeking the death penalty, that we had been advised they would not offer life without parole.
"THE COURT: Do you understand that, Mr. Frazier?
 "THE DEFENDANT: It don't make no sense to me. If I'm guilty, I'm guilty; if I'm innocent, I'm innocent. Because it's the law don't make sense, since with that what I'm pleading with, don't mean for me it's right. I said I'm guilty, I'm guilty. I ain't pleading innocent.
 "You going to tell the jury that I'm pleading innocent, then I got to sit in front of the jury, they going to hear the tapes and the statements, say, `Why is the man pleading innocent when he made a statement and got it on tape that he's guilty?' So the jury automatically going to be against me automatically any way you go. I'm still guilty. And I don't like it, the way y'all tell the jury that I'm innocent. I ain't innocent.
 "THE COURT: Well, you also understand there's an issue of punishment in this case, even if you're found guilty; do you understand that?
"THE DEFENDANT: Yeah, I understand the punishment.
 "THE COURT: And the possible punishment is death or life without parole.
 "THE DEFENDANT: Yeah, I understand that. But what that got to do with innocent and guilty? What if I'm pleading —
 "THE COURT: Well, do you understand if you've pled guilty at that point that —
 "THE DEFENDANT: Why we going through this, then, if I'm guilty already? I already — we already know that. That's why I don't trust my attorneys *Page 592 
 right here, because it don't make no sense to me, I'm going through a trial and the trial like this is — I don't know what this trial's for.
 "THE COURT: Well, Mr. Street and Mr. Neumann, have you gone over that with Mr. Frazier?
 "MR. STREET: We have told Mr. Frazier that we're trying to save his life, Your Honor. I mean, there obviously is a question of punishment in this case; we would not be offered life without parole. As I previously stated Mr. Brown made it perfectly clear to the jury during our questioning yesterday that they were going to seek the death penalty. And that has been made clear to Mr. Frazier, why we're here.
 "THE DEFENDANT: Well, what that got to do with me pleading innocent, that's why I'm talking about. I filed — that don't make no sense to me I'm pleading innocent when I'm not innocent.
 "THE COURT: Well, have you discussed with him the sentencing process if he decided to plead guilty to the underlying offense?
 "MR. STREET: We haven't discussed that with him, not believing that he would plead guilty, knowing that there's a possibility that he could get sentenced to the electric chair, no, sir. We only discussed the possibility of a life without parole if he pled guilty, not the possibility of facing the death penalty. We will be glad to discuss that with him.
 "THE COURT: All right. You might want to discuss that with him a few minutes."
(R. 185-95.) (Emphasis added.)
After a short recess, counsel indicated that they were ready for trial. The trial court instructed the jury on some preliminary matters, and opening statements began.
During the prosecution's opening statement, the appellant threw a writing pen at the jury, cursed, and expressed his displeasure at the racial composition of the jury. The appellant was escorted from the courtroom. (See Part III of this opinion for a more thorough rendition of what occurred during the appellant's outburst.)
A discussion ensued about whether the trial could proceed in the appellant's absence. The trial court ultimately decided to move the trial to a different courtroom, where the appellant could observe the trial from a media room.
The appellant argues that "[f]rom the record it is clear that [he] had neither the requisite ability to communicate rationally with his attorneys, nor the ability to rationally or factually understand the proceedings against him." (Appellant's brief, p. 13.) Accordingly, he contends that "the trial court should have ordered a mental examination . . . in order to ensure that he received a fair trial." (Appellant's brief, p. 13.)
The appellant's violent outburst and his belligerent, disrespectful, and suspicious behavior toward the court, the jury, and his counsel all appear to be the result of a bad temper and poor judgment — not a lack of competency to stand trial. The record reflects that when the appellant wanted to, he was able to act appropriately. In fact, the appellant was allowed to return to the courtroom the day after his outburst, and the remainder of the trial proceeded without incident. The appellant's professed consternation over being tried after having confessed to the crime does not indicate an incompetency to stand trial, as that term is defined in Rule 11.1, Ala.R.Crim.P. On the contrary, the appellant's opinion that the jury would be confused because his confession was inconsistent with his plea of not guilty is quite astute — it indicates an understanding that his confession could be very damaging to his case. Furthermore, any apparent confusion over why he was being tried after having confessed appears to have been resolved when he consulted with his trial counsel. *Page 593 
"`The trial court is in a far better position than the reviewing court to determine a defendant's competency to stand trial.'" Matthews v. State, 671 So.2d 146, 148 (Ala.Cr.App. 1995), quoting Dill v. State, 600 So.2d 343, 371 (Ala.Cr.App. 1991), aff'd, 600 So.2d 372 (Ala. 1992), cert. denied,507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993). Although the appellant's actions during trial were often not in his best interest, the record does not support the conclusion that he lacked the "ability to assist in his . . . defense by consulting with counsel with a reasonable degree of rational understanding of the facts and the legal proceedings against" him. Rule 11.1, Ala.R.Crim.P. Accordingly, we cannot say that the trial court abused its discretion by failing to order a mental evaluation of the appellant for purposes of determining whether he was competent to stand trial.
 III.
The appellant contends that "[t]he trial court committed reversible error by failing to grant a mistrial after the appellant narrowly missed a juror with a thrown object and yelled inflammatory accusations toward the jury." (Appellant's brief, p. 15.) We disagree.
During the prosecution's opening statement, the following occurred:
 "THE DEFENDANT: (Throws pen across room toward the jury.) Shut the fuck up. That jury right there is racist, man. That jury is racist, man, look at them. That guy looking at me, man. That jury is racist, man. That jury is racist, man. Look at them. Look at that jury, man, 10 mother-fucking white jurors up there. Fuck that.
 "(Whereupon, the Defendant was escorted from the courtroom.)
"THE COURT: Go ahead, Mr. Brown [prosecutor].
 "MR. NEUMANN [defense counsel]: We've got a motion to make, your Honor.
 "THE COURT: Folks, I'm going to ask you to go back in the jury room just for a minute, please.
". . . .
 "MR. NEUMANN: Your Honor, at this time we would ask the Court to grant a mistrial in regard to the case before the Court. We feel that the Defendant's remarks have extremely prejudiced his case with regard to the jury, and I'm referring specifically to the inflammatory accusations that he's made toward the jury.
 "We feel that this has tainted, perhaps, their perspective on the case, and we do not feel that he would be able to receive a fair trial from this jury. And for that reason we request a mistrial.
 "And we also request that we be relieved from representation of Mr. Frazier due to the fact that we have spent at least 10 or 15 minutes further explaining the procedure and so forth, which we had previously explained to Mr. Frazier sometime last week. He said he under — he indicated that he understood, he was ready to go to trial, and then when we get out, it obviously has been for naught.
 "And I'm referring back to the fact that this goes to point out that for whatever reason he has, he doesn't trust us, and that we do not feel like we could adequately represent him with regard to any further communications throughout the course of the trial.
 "THE COURT: Well, I would like the record to reflect that not only did Mr. Frazier make the remarks that are recorded, Mr. Frazier also threw an object at the jury box and came very close to hitting one of the jurors. I'm not sure what the object was. It appeared to be a pen or something —
"MR. STREET: It was a pen, Your Honor.
 "THE COURT: One of the Counsel's pens, which he threw before he made his remarks. It's very clear to the Court that Mr. Frazier has done this purposefully. *Page 594 
 He doesn't want to be present in the courtroom, despite our admonitions and our explanations about the consequences of his behavior and that sort of thing. And I'm going to deny the motion for a mistrial. And we'll just proceed without him . . . .
 "All of this has been brought on by the behavior and willfulness of the Defendant, despite our attempt to make this a fair proceeding . . . . It wouldn't be fair to the State to declare a mistrial in this case because of the purposeful and willful behavior on behalf of the Defendant, which apparently was his purpose."
(R. 199-203.) (Emphasis added.)
A discussion ensued about whether the trial could proceed in the appellant's absence. The trial court ultimately decided to move the trial to a different courtroom, where the appellant could observe the trial from a media room. Court then recessed for lunch.
After returning from the luncheon recess, the following occurred:
 "MR. NEUMANN: . . . We would ask that the Court bring the jury out before we get started and poll the jury as to any possible reactions they might have with regard to the remarks that Mr. Frazier made and the actions that he took this morning that could possibly influence them or perhaps even prejudice them against the Defendant with regard to the trial, itself . . . .
". . . .
 "THE COURT: Well, I want to go back on the record in regard to some things that happened before lunch so the record will be clear about what our present situation is.
 "As everyone knows at this point, after the Court repeatedly warned the Defendant about the consequences of his behavior while present in the courtroom and, of course, the consequences of not being present during the trial of this case, and the Defendant repeatedly told the Court that he did not want to be here, that he wanted to be in the hole and that if he was left in the courtroom that he would be violent, and I believe he made reference to assaulting defense counsel at one point.
 "Despite my warnings and threats, I allowed him to stay in the courtroom. And, of course, he acted on his threat in the presence of the jury during opening statements by throwing a writing pen at the jury box and came within inches of hitting one of the jurors in the face with that object, and also making some abusive and obscene remarks apparently addressed at the jurors and the fairness of this proceeding.
 "The Court now has the Defendant in what we call the `media room' in the lower courtroom in the courthouse, and this is the room that's normally used by media so they could observe the proceedings as well as hear the proceedings during a trial and not interrupt a trial.
". . . .
 "The Defendant has requested that the Court poll the jurors in regard to the actions that took place before we broke for lunch. Does the State have any response to that request?
 "MR. BROWN [prosecutor]: Well, Judge, obviously you can't unring a bell. As I understood Mr. Neumann's request, was that the Court require the jury by, and in so doing implant in their minds the idea that they should completely ignore this, and I would point out to the Court that comments the Defendant made this morning injected the issue of race into this trial, which had no place here, never has any place in a trial, shouldn't be here, and I'd feel `hamstrung' if the jurors were to be instructed to ignore that and thus not affording us an opportunity at any point throughout the course of this trial to address that issue. That's my only problem in that respect.
 "I think it might be best left ignored under the circumstances. If the Court's going to explain to the jury what the *Page 595 
 logistics of the situation are and Mr. Frazier is in a position to be able to see and hear the proceedings, that it might be more detrimental to both the Defendant and to us to even address that issue.
 "Now, if there were any of the jurors who would say, and I think if they insist on them being polled, who would say `I don't think I can be fair,' then that would be a different matter, but I would hope the Court wouldn't go beyond that point.
 "THE COURT: Well, I think at this point, I'm merely going to ask the jurors if there's anyone who feels they cannot be fair in this trial, given what took place in the morning and leave it at that and see if there's any response to that question."
(R. 209-14.)
When the trial court asked the jurors whether they would be unable to give the state and the appellant a fair trial, none of the jurors responded affirmatively.
 "`A trial judge is allowed broad discretion in determining whether a mistrial should be declared because he is in the best position to observe the scenario, to determine its effect upon the jury, and to determine whether the mistrial should be granted.' Dixon v. State, 476 So.2d 1236, 1240 (Ala.Cr.App. 1985). `A mistrial is an extreme measure and should be denied when the prejudicial quality of the comment [or incident] can be eradicated by curative instructions.' Walker v. State, 631 So.2d 294, 300 (Ala.Cr.App. 1993)."
Berryhill v. State, 726 So.2d 297, 302-303 (Ala.Cr.App. 1998). The trial court determined that the appellant should not profit from his intentionally disruptive conduct, so it denied the motion for a mistrial. We find no abuse of discretion in the trial court's denial of the motion.
 "As was previously stated in Hayes v. State, 340 So.2d 1142, 1143 (Ala.Cr.App. 1976), cert. denied, 340 So.2d 1144 (Ala. 1977):
 "`As to the appellant's contention that a mistrial should have been declared, we hold that one cannot purposefully create grounds for a mistrial by deliberately causing a disturbance during the trial. See Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). Such a conclusion is obviously necessary, otherwise a defendant faced with imminent conviction could disrupt the trial, prejudice himself in the jury's eyes and, therefore, be entitled to another trial.'
 "`We will not condone such and thus will not allow a defendant to benefit from his own misconduct in the courtroom. The trial judge here acted in a judicious and completely proper manner, and we find no error on his part in denying the motion for a mistrial.'"
Hayes v. State, 340 So.2d 1142, 1143 (Ala.Cr.App. 1976), quoted with approval in Clemons v. State, 720 So.2d 961, 976 (Ala.Cr.App. 1996), aff'd, 720 So.2d 985 (Ala. 1998). See also Mack v. State,736 So.2d 664 (Ala.Cr.App. 1998) (a defendant will not be allowed to profit from disruptive behavior).
The appellant argues that the trial court's polling of the jury was insufficient to eradicate any prejudice caused by his behavior because the questioning did not occur promptly after his disruptive conduct and because it was not accompanied by any curative instructions. The appellant did not object to the trial court's failure to promptly question the jurors regarding the outburst, nor did he request any curative instructions. In fact, he never indicated that he was dissatisfied with the trial court's remedy of simply questioning the jurors to determine if they were adversely effected by his outburst.
 "`[T]here is no requirement that in making a motion for a mistrial, defense counsel include a request for instructions to disregard.' Covington v. State, *Page 596 
 620 So.2d 122, 127 (Ala.Cr.App. 1993). See also Ex parte Marek, 556 So.2d 375, 379 (Ala. 1989).
 "While a defendant's failure to request instructions as part of his motion for a mistrial will not constitute a waiver of the issue of the failure to instruct, we think it should weigh against any claim of prejudice. Cf. Ex parte Hart, 612 So.2d 536, 537 (Ala. 1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666
(1993) (in a capital case, `[t]he failure to object will weigh against any claim of prejudice'); Dill v. State, 600 So.2d 343, 360 (Ala.Cr.App. 1991), affirmed, 600 So.2d 372 (Ala. 1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993) ('[w]hile th[e] failure [to object] does not preclude our review [in capital cases], it does weigh against any claim of prejudice')."
Allen v. State, 659 So.2d 135, 145 (Ala.Cr.App. 1994). (Emphasis added.)
Although perhaps the better practice would have been to question the jurors immediately regarding any prejudice as a result of the appellant's outburst, and then to instruct the jurors to disregard the appellant's disruptive behavior, under the unique facts of this case, we cannot say that the failure to do so amounted to plain error. Rule 45A, Ala.R.App.P. The trial court did ascertain that the jurors were not biased against the appellant because of his conduct in the courtroom. An argument can be made that any further action by the trial court would only have unduly emphasized the appellant's conduct.
During the trial, as the appellant's audiotaped confession was being played, two members of the victim's family became emotional. Specifically, the following occurred:
 "MS. PHYLLIS BROWN: Why you did that, why did you hurt mama like that? Why you do her like that?
 "MS. STARKS: That's my baby. Oh, mercy, I can't take that. I can't take no more."
(R. 443.) Both family members were escorted from the courtroom.
The appellant later moved for a mistrial, arguing that the outburst from the victim's family members had prejudiced his case. The trial court denied the motion for a mistrial.
The appellant contends that the trial court erred in denying his motion for a mistrial. He maintains that at the very least, the trial court should have instructed the jury to disregard the outbursts. The state did not address this contention in its brief to this Court.
The appellant's motion for a mistrial was not timely — it was not made immediately after the victim's family members made the statements. Powell v. State, 631 So.2d 289, 292 n. 2 (Ala.Cr.App. 1993.) Nevertheless, because this is a case where the death penalty has been imposed, the appellant's failure to timely move for a mistrial does not preclude review of this allegation under the plain error rule. Rule 45A, Ala.R.App.P.
We have thoroughly reviewed the record and find no plain error in the trial court's failure to grant the mistrial.
 "In McNair v. State, 653 So.2d 320 (Ala.Cr.App. 1992), this Court held:
 "`"As a general rule, a demonstration by, or the misconduct of, a bystander or spectator during a criminal trial — including even a disturbance having a tendency to influence or disturb the jury — is not deemed to be sufficient reason for the granting of a new trial unless it appears that the rights of the accused were prejudiced thereby, and, generally, in the absence of a showing to the contrary, it will be assumed that the jury was not prejudiced; similarly, manifestations of grief by spectators related to the victim of a crime, as a general matter, will not alone furnish good ground for a new trial, a showing being required that the case of the *Page 597 
accused was prejudiced by such conduct."
 "`Annot., 31 A.L.R.4th 229, 234-35 (1984). This same general rule also applies to emotional manifestations made while testifying. 31 A.L.R.4th at 235-36. See Hall v. State, 500 So.2d 1282, 1290-91 (Ala.Cr.App. 1986) (rape victim cried during her testimony); Smith v. State, 37 Ala. App. 116, 118, 64 So.2d 620, 621, cert. denied, 258 Ala. 647, 64 So.2d 622 (1953) (assault victim "cried aloud" during testimony); James v. State, 44 Ala. App. 593, 595, 217 So.2d 545, 547 (1969) (assault with intent to rape victim cried twice during testimony); Lee v. State, 265 Ala. 623, 627, 93 So.2d 757, 761 (1957) (wife of deceased murder victim "sobbing" while testifying; Duff v. State, 40 Ala. App. 80, 83, 111 So.2d 621, 624 (1958), cert. denied, 269 Ala. 696, 111 So.2d 627 (1959) (mother of deceased murder victim "crying out loud" during prosecutor's opening statement). This rule applies in capital cases. See Henderson v. State, 583 So.2d 276, 287
(Ala.Cr.App. 1990), affirmed, 583 So.2d 305
(Ala. 1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992).
 "`The emotional manifestations present rise nowhere near the level presented in Collum v. State, 21 Ala. App. 220, 221, 107 So. 35, 35-36 (1926) (new trial required where in a prosecution for seduction, the prosecutrix fainted in the witness chair, and mother came to her aid weeping and crying, "Nobody knows how much we have suffered over this trouble. Lord have mercy on us.") and White v. State, 25 Ala. App. 323, 324, 146 So. 85 (1933) (new trial required where widow of murder victim contradicted defense counsel during his closing argument).
 "`Here, as in Smith, 37 Ala. App. at 118, 64 So.2d at 621: "The trial judge witnessed the incidents. To him must of necessity be committed a wide discretion in determining whether or not the occurrences affected the rights of the accused to a fair, impartial trial." We find no merit to the appellant's argument that the prosecution should have been required to call witnesses who were not members of the victim's family.'
 "See also Uldric v. State, 43 Ala. App. 477, 480, 192 So.2d 736, 739, cert. denied, 280 Ala. 718, 192 So.2d 739
(1966) (mistrial properly denied where judge promptly instructed and admonished jury to disregard outburst by widow of deceased)."
DeBruce v. State, 651 So.2d 599, 608-09 (Ala.Cr.App. 1993), aff'd, 651 So.2d 624 (Ala. 1994). See also Gaddy v. State,698 So.2d 1100, 1140 (Ala.Cr.App. 1995), aff'd, 698 So.2d 1150
(Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613
(1997).
The appellant did not request that the trial court admonish the jury to disregard the outburst by the victim's family members. As discussed above, this failure to request curative instructions weighs heavily against any claim of prejudice. Allen, supra. While the better practice would have been to instruct the jury to disregard the outburst, we cannot say that the trial court's failure to do so amounts to reversible error, especially in light of the fact that the appellant apparently did not find the conduct so offensive as to move immediately for a mistrial or to request curative instructions.
 IV.
The appellant contends that he was denied the effective assistance of trial counsel because, he claims:
 A. Counsel failed to "communicate with him, and adequately advise him of his rights and options" (Appellant's brief, p. 24);
 B. Counsel "failed to provide the trial court with enough information to support a court-ordered mental examination" *Page 598 
before trial (Appellant's brief, p. 27);
 C. Counsel failed to make a Batson motion at the conclusion of jury selection; and
 D. Counsel failed to investigate and to properly prepare for the guilt phase and the sentencing phase of the trial and counsel failed to present sufficient mitigating evidence at the sentencing phase of the trial.
None of these allegations of ineffective assistance of trial counsel were presented to the trial court. Nevertheless, this Court is obliged to review the appellant's allegations pursuant to the plain error doctrine. Rule 45A, Ala.R.App.P.
 "In order to prevail on an ineffective assistance of counsel claim, a defendant must meet the two-pronged test set out by Strickland v. Washington, 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct. 2052 (1984).
 "`First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.'
"Id. at 687.
 "`The performance component outlined in Strickland is an objective one: that is, whether counsel's assistance, judged under "prevailing professional norms," was "reasonable considering all the circumstances."' Daniels v. State, 650 So.2d 544, 552 (Ala.Cr.App. 1994) (quoting Strickland, 466 U.S. at 688). Once a defendant has identified the specific acts or omissions that allegedly were not the result of reasonable professional judgment on counsel's part, the court must determine whether those acts or omissions fall outside the wide range of professionally competent assistance. Id.
 "When reviewing a claim of ineffective assistance of counsel, we indulge a strong presumption that counsel's conduct was appropriate and reasonable. Hallford v. State, 629 So.2d 6 (Ala.Cr.App. 1992), cert. denied, 511 U.S. 1100, 128 L.Ed.2d 491, 114 S.Ct. 1870 (1994); Luke v. State, 484 So.2d 531 (Ala.Cr.App. 1985).
 "`Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'
"Strickland, 466 U.S. at 689 (citations omitted). See Ex *Page 599 
parte Lawley, 512 So.2d 1370, 1372 (Ala. 1987).
 "And, even if an attorney's performance is determined to be deficient, the petitioner is not entitled to relief unless it is also established that `there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' Strickland, 466 U.S. at 694. "In an ineffective assistance of counsel claim, the burden is on the claimant to show that his counsel's assistance was ineffective. Ex parte Baldwin, 456 So.2d 129 (Ala. 1984), aff'd, 472 U.S. 372, 86 L.Ed.2d 300, 105 S.Ct. 2727 (1985)."
McNair v. State, 706 So.2d 828, 839 (Ala.Cr.App. 1997), cert. denied, 523 U.S. 1064, 118 S.Ct. 1396, 140 L.Ed.2d 654 (1998). See also Mason v. State, [Ms. CR-94-2143, March 6, 1998] ___ So.2d ___ (Ala.Cr.App. 1998).
 A.
The appellant claims that his trial counsel were ineffective because, he alleges, counsel failed to "communicate with him, and adequately advise him of his rights and options." (Appellant's brief, p. 24.) Specifically, the appellant claims that his counsel met with him only three times before trial, and that counsel failed to adequately discuss with him the possibility and ramifications of pleading guilty to the charged offenses. In support of these assertions, the appellant directs this Court to the lengthy discussion that occurred before trial in which he indicated to the trial court that he was dissatisfied with his trial counsel. (See Part II of this opinion for an excerpt of that discussion.)
In that discussion, counsel responded that they had spent many hours preparing for the case. In addition, counsel indicated that while they had discussed the possibility of the appellant's pleading guilty in return for a recommendation from the prosecution of a sentence of life without parole, they had not discussed the possibility of the appellant's pleading guilty in return for a recommended death sentence. The trial court instructed the appellant's counsel to discuss with the appellant all the potential ramifications of pleading guilty to the charged offense. After a discussion with his counsel, the appellant apparently decided to proceed with the trial.
The appellant has met neither prong of the Strickland test. He has presented no evidence, other than his unsubstantiated assertion at trial, that his counsel met with him only three times before trial. Even assuming for the sake of argument that counsel met with the appellant in person only three times before trial, the appellant has failed to establish how this alone rendered counsel's performance deficient, or how he was prejudiced by any allegedly deficient performance. The appellant has additionally failed to prove his allegation that his counsel were ineffective because they did not inform him at an earlier date of the possibility and ramifications of pleading guilty in return for a recommended death sentence, or how he was prejudiced by not having received this information sooner.
 B.
The appellant next claims that his trial counsel were ineffective because they failed to present sufficient information to support a court-ordered mental evaluation prior to trial. The appellant not only fails to state what additional information could have been presented in support of the motion, but he also fails to establish that the additional information would have warranted a court-ordered mental evaluation. Again, the appellant has failed to meet either prong of the Strickland test.
 C.
The appellant alleges that his trial counsel were ineffective because they did not make a Batson motion at the conclusion *Page 600 
of jury selection. In addition, he argues that
 "defense counsel did not even preserve for the record what the racial composition of the jury was, nor did they indicate what strikes were used against blacks, whites, females, males, etc. The only reference to the racial composition of the jury comes directly from the appellant himself, when he complained about the jury being ten whites and only four blacks [see Part II and Part III of this opinion] . . . . The failure of defense counsel to preserve this information for the record, renders the appellant incapable of raising this issue on appeal."
(Appellant's brief, p. 28.)
The Alabama Supreme Court has held that "the failure of trial counsel to make a timely Batson objection to a prima facie case of purposeful discrimination by the State in the jury selection process through its use of peremptory challenges is presumptively prejudicial to a defendant." Ex parte Yelder, 575 So.2d 137, 139
(Ala.), cert. denied, 502 U.S. 898, 112 S.Ct. 273, 116 L.Ed.2d 225
(1991). (Emphasis added.) The record does not raise an inference of purposeful discrimination in the prosecution's use of its peremptory challenges. See Smith v. State, 37 Ala. App. 166,64 So.2d 620, 621 (Ala.Cr.App. 1998), quoting Rieber v. State,663 So.2d 985, 991 (Ala.Cr.App. 1994), aff'd, 663 So.2d 999
(Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437
(1995) ("[f]or plain error to exist in the Batson context, the record must raise an inference that the state . . . engaged in `purposeful discrimination' in the exercise of its peremptory challenges.") We simply cannot determine from the record before this Court whether a prima facie case of discrimination was present, and whether counsel should have made a Batson motion. This Court will not presume error from a silent record. Stegall v. State, 628 So.2d 1006, 1009 (Ala.Cr.App. 1993). It is possible that counsel's decision not to make a Batson motion was a strategic choice. Accordingly, the appellant has failed to establish that his counsel were ineffective for not making a Batson motion. This situation exemplifies why claims of ineffective assistance of counsel should first be presented to the trial court before being addressed on appeal. See Jackson v. State, 534 So.2d 689, 692-93
(Ala.Cr.App. 1988); Ex parte Ingram, 675 So.2d 863, 865 (Ala. 1996).
 D.
Last, the appellant claims that his trial counsel were ineffective because, he asserts, counsel failed to adequately investigate and prepare for trial. In support of this assertion, he argues that counsel failed to present any evidence at the guilt phase of the trial, and that counsel failed to present sufficient evidence in mitigation at the sentencing phase of the trial. The appellant does not state what additional evidence could have been offered, or how that evidence would have changed the outcome of the proceedings. Accordingly, he has met neither prong of the Strickland test. See Brooks v. State, 695 So.2d 176, 181 (Ala.Cr.App. 1996), aff'd, 695 So.2d 184 (Ala.), cert. denied, 522 U.S. 893,118 S.Ct. 233, 139 L.Ed.2d 164 (1997).
 V.
The appellant contends that the "trial court committed reversible error by allowing the prosecution to make numerous prejudicial comments in opening and closing statements which inflamed the passion and prejudice of the jury and led to the appellant's conviction and sentence of death." (Appellant's brief, p. 35.) He alleges that "the net sum of these comments was so prejudicial as to render [his] trial unfair, and the jury's verdict of guilty and recommended sentence of death unreliable." (Appellant's brief, p. 35.)
The appellant did not object to most of the allegedly improper comments; thus, this Court will review the comments pursuant to the plain error doctrine. Rule 45A, Ala.R.App.P. *Page 601 
 "`"This court has concluded that the fail to object to improper prosecutorial arguments . . . should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful." Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir. 1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).'
 "Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
". . . .
 "As the United States Supreme Court stated in Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986):
 "`[I]t "is not enough that the prosecutors' remarks were undesirable or even universally condemned." The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).'
"(Citation omitted.)
 "We must evaluate the comment in the context of the entire proceedings.
 "`"Whatever is in evidence is considered subject to legitimate comment by counsel." Bankhead v. State, 585 So.2d 97 (Ala.Cr.App. 1989), aff'd, 585 So.2d 112 (Ala. 1991). See also Ward v. State, 440 So.2d 1227 (Ala.Cr.App. 1983). "The prosecutor has the right to present his impressions from the evidence. He may argue every matter of legitimate inference and may examine, collate, sift, and treat the evidence in his own way." . . . Donahoo v. State, 505 So.2d 1067, 1072
(Ala.Cr.App. 1986).'
 "Williams [v. State], 601 So.2d [1062,] at 1072-73 [(Ala.Cr.App. 1991)]. `"[C]ounsel in the trial of any lawsuit has the unbridled right (to be sure, duty) to argue the reasonable inferences from the evidence most favorable to his client."' Kuenzel, 577 So.2d at 492, quoting Ex parte Ainsworth, 501 So.2d 1269, 1270 (Ala. 1986). (Footnote omitted.) . . . `"Counsel for the state and defendant are allowed a rather wide latitude in drawing their deductions from the evidence."' Kuenzel, 577 So.2d at 493, quoting Arant v. State, 232 Ala. 275, 279, 167 So. 540, 543 (1936) . . . ."
Burton v. State, 651 So.2d 641, 651-52 (Ala.Cr.App. 1993), aff'd, 651 So.2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115,115 S.Ct. 1973, 131 L.Ed.2d 862 (1995). See also Mason v. State, [Ms. CR-94-2143, March 6, 1998] ___ So.2d ___ (Ala.Cr.App. 1998).
 A.
The appellant alleges that, in its opening and closing arguments at the guilt phase of the trial, and again during its closing argument at the sentencing phase of the trial, the prosecution improperly injected the issue of sympathy for the victim and her family.
In support of his assertion, he cites the following comments from the prosecution's opening argument at the guilt phase of the trial:
 "Pauline Brown died two days before Thanksgiving in 1991. She wasn't somebody that our grandchildren are going to read about in the history books, she didn't accumulate a million dollars in her lifetime. Who was this faceless person whose name appears in that indictment?
". . . .
 "She came from a good family, that kind of family, whose mother had worked for over 30 years in the Birmingham Housing Authority. And, Curtis, her brother, who you met yesterday, has worked for ACIPCO for 25 years. Good, decent, honest people. *Page 602 
 "In November of 1991 the family was planning their Thanksgiving. The girls were divvying up the food things that they were all going to take to Augusta's house for Thanksgiving dinner."
". . . .
 "Pauline was 40 years old, in the prime of her life, had raised her two daughters. Six weeks ago Phyllis had her baby; she would have been a grandmother for the first time. And that grandbaby will never see grandmother because Demetrius Frazier got tired of listening to Pauline beg."
(R. 198-99; 220.)
After viewing the allegedly objectionable comments in the context of the entire opening statement, we find no plain error. "The purpose of opening statements is for each party to give the jury an overview of what the evidence will show." McKinney v. State, 654 So.2d 95, 98 (Ala.Cr.App. 1995). Contrary to the appellant's assertion, we do not believe that the prosecutor's comments were intended to inject irrelevant or prejudicial information into the trial; rather, the prosecutor was setting forth what he expected the evidence to establish.
The prosecution did establish at trial, without objection, that Pauline Brown was the daughter of Augusta Starks, that she had worked as a cook for Bama Foods for 20 years, and that she had two daughters. In addition, the prosecution established, without objection, that Augusta Starks last spoke with Pauline around 8:30 p.m. on the Tuesday before Thanksgiving, and that they discussed their Thanksgiving plans. The state elicited testimony, again without objection, that Augusta Starks learned of her daughter's murder the next day, while she was working at the Birmingham Housing Authority, where she had been employed for 30 years. The state also established that the appellant murdered Pauline Brown because she continued to beg for her life during the assault. (R. 398.) All of the above facts were properly admitted into evidence; they were relevant to the prosecution's reconstruction of the crime. See McNair v. State, 653 So.2d 320, 333-36 (Ala.Cr.App. 1992), aff'd, 653 So.2d 353 (Ala. 1994), cert. denied,513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995).
Accordingly, the following portions of the prosecutor's closing argument at the guilt phase of the trial do not constitute plain error:
 "Well, Ladies and Gentlemen, you heard some evidence, testimony of witnesses, and you learned who Pauline Brown was, a 40-year-old woman living in Birmingham, old enough to have two children of her own, two beautiful daughters, Pam and Phyllis. And even though she was old enough to have her own children, she was somebody's baby. She was Augusta Starks's baby, and always will be."
". . . .
 "All a few days before she was going to celebrate Thanksgiving with her family."
(R. 456-57, 459.) The prosecutor's comments were based upon the evidence presented at trial or were legitimate inferences derived from that evidence. Burton, supra.
Even if we were to conclude that the above-mentioned comments from the prosecution's opening and closing argument at the guilt phase were erroneous, reversal would not be warranted.
 "`Recently, this Court examined the issue of victim impact evidence in Ex parte Rieber, 663 So.2d 999 (Ala. 1995). In Rieber, we acknowledged that testimony regarding a murder victim's children was not relevant to the issue of the accused's guilt or innocence and was, thus, inadmissible during the guilt phase of trial; we noted, however, that "a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant." *Page 603 
 663 So.2d at 1005. After thoroughly reviewing the record of this present case, we conclude that the limited testimony regarding Ms. Brown's infant son and the impact of Ms. Brown's death on her family, and the prosecution's limited references to such evidence, did not operate to deny Land a fair trial or to prejudice his substantial rights. Thus, we find no reversible error as to this issue.'
 "Ex parte Land, 678 So.2d 224, 236 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996).
 "In Ex parte Rieber, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437
(1995), the Alabama Supreme Court held as follows:
 "`We agree with Rieber that Mr. Craig's testimony concerning Ms. Craig's children, their ages, and the status of their custody after the murder was not relevant with respect to the question of his guilt or innocence and, therefore, that it was inadmissible in the guilt phase of the trial. The only issue before the jury during the guilt phase of the trial was whether Rieber had robbed and killed Ms. Craig. However, in Ex parte Crymes, 630 So.2d 125 (Ala. 1993), a plurality of this Court held in a capital murder case in which the defendant was sentenced to life-imprisonment without parole that a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant. See, also, Giles v. State, 632 So.2d 568 (Ala.Crim.App. 1992), aff'd, 632 So.2d 577 (Ala. 1993), cert. denied, [512] U.S. [1213], 114 S.Ct. 2694 (1994); Ex parte Parker, 610 So.2d 1181
(Ala. 1992), cert. denied, [509] U.S. [929], 113 S.Ct. 3053 (1993); Lawhorn v. State, [581 So.2d 1159 (Ala.Cr.App. 1990)]; Hooks v. State, 534 So.2d 329 (Ala.Crim.App. 1987), aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 102 L.Ed.2d 1005, 109 S.Ct. 883 (1989); and Ex parte Whisenhant, [555 So.2d 235 (Ala. 1989)], applying a harmless error analysis in death penalty cases. Our review of the record indicates that Rieber's attorneys did not object to Mr. Craig's brief references to Ms. Craig's children or ask him any questions on cross-examination. The trial court clearly instructed the jury that it had to determine, based on all of the evidence, whether Rieber had robbed and killed Ms. Craig. The jury was instructed that it could not find Rieber guilty unless the prosecutor had established his guilt beyond a reasonable doubt. The jury was also instructed not to let sympathy or prejudice affect its verdict. We caution prosecutors that the introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law. However, after examining the record in its entirety, we conclude that the aforementioned portions of Mr. Craig's testimony, although they should not have been permitted, did not operate to deny Rieber a fair trial. It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that Rieber did not receive a fair trial simply because the jurors were told what they probably had already suspected — that Ms. Craig was not a "human island," but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents *Page 604 
 (paraphrasing a portion of Justice Souter's opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 115 L.Ed.2d 720, 111 S.Ct. 2597
(1991)).'
"663 So.2d at 1005-06 (emphasis supplied [in Smith])."
Smith v. State, 37 Ala. App. 116 64 So.2d 620,621 (Ala.Cr.App. 1998). See also Hyde v. State, [Ms. CR-95-2036, January 30, 1998] ___ So.2d ___ (Ala.Cr.App. 1998).
In this case the evidence against the appellant was compelling — the appellant confessed and his confession was corroborated by the state's evidence. The jurors were instructed several times that the arguments of counsel were not to be considered as evidence. In addition, they were instructed that they should base their verdict strictly on the evidence, and that they could not find the appellant guilty unless the prosecution proved its case beyond a reasonable doubt. "The jury is presumed to follow the instructions given by the trial court." Hutcherson v. State, 727 So.2d 846, 854 (Ala.Cr.App. 1997), aff'd,727 So.2d 861 (Ala. 1998) (citing Taylor v. State,666 So.2d 36 (Ala.Cr.App.), opinion extended on remand,666 So.2d 71 (Ala.Cr.App. 1994), aff'd, 666 So.2d 73
(Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct 928,133 L.Ed.2d 856 (1996)). Accordingly, even if the prosecutor's comments were construed as an improper attempt to invoke sympathy for the victim and her family, no plain error occurred. Rule 45A, Ala.R.App.P.
The appellant also contends that the prosecution improperly injected the issue of sympathy for the victim and her family during the following portion of its closing argument at the penalty phase of the trial:
 "I didn't have the privilege of knowing Pauline. I wish I had, because I know a lot about her from my friends, and I'm proud to say that Augusta and Curtis and Fred and Pam and Phyllis are my friends. And I wish I'd known Pauline better, because I'm the last person on the face of this earth who ever gets to say anything on her behalf, to beseech you on her behalf for justice. And I feel inadequate. And knowing her would have helped me, I'm sure. And I hope she can help me, where she is.
". . . .
 "One day, one Thanksgiving or one summer at the Starks family reunion, when Phyllis's baby is a few years older and the eating's done and it's time to sit down in the chair and have grandma read a book, Phyllis's little girl is going to say to her, `Momma, why don't I have a grandma?' And the only thing she's going to be able to do is pat her on the head and say, `Don't cry, baby. It's not so bad. She was killed by a black man."[2]
(R. 565; 573-74.)
We find no plain error in the prosecutor's comments during the closing argument at the penalty phase of the trial. "We have held that it is not reversible error for a prosecutor to suggest that he is speaking on behalf of the victim's family." Burgess v. State,723 So.2d 747, 754 (Ala.Cr.App. 1997), aff'd, 723 So.2d 770
(Ala. 1998). See also George v. State, 717 So.2d 849 (Ala.Cr.App. 1997), aff'd, 717 So.2d 858 (Ala.), cert. denied, 525 U.S. 1024,119 S.Ct. 556, 142 L.Ed.2d 462 (1998). Furthermore, victim impact argument is not prohibited at the penalty phase of the trial. Hutcherson v. State, 727 So.2d 846 (Ala.Cr.App. 1997), aff'd,727 So.2d 861 (Ala. 1998); Ex parte Slaton, 680 So.2d 909
(Ala. 1996), cert. denied, 519 U.S. 742, 117 S.Ct. 742,136 L.Ed.2d 680 (1997).
 B.
We find no plain error in the prosecution's exhortation to the jury to "do the right thing" during its closing argument at the penalty phase of the trial.
 "Generally, the prosecutor is in error by exhorting the jury to `do what's right,' *Page 605 
 or to `do its job,' if that exhortation `implies that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court's instructions on the law."
McNair v. State, 653 So.2d at 339-340. Contrary to the appellant's assertion, we are not convinced that the prosecutor was encouraging the jury "to recommend a sentence of death regardless of the weight of the evidence or the instructions of the trial court." (Appellant's brief, p. 39.) (Emphasis added.) Rather, when the comment is viewed in the context of the entire closing argument, it is clear that the prosecutor was encouraging the jury to recommend a death sentence based upon the evidence and the law.
 C.
The appellant claims that the prosecution improperly commented on his character and on prior bad acts. In support of this assertion, he refers this Court to two portions of the prosecution's closing argument made during the penalty phase of the trial.
In the first instance of alleged improper argument, the prosecution stated:
 "And Judge McCormick told you that unlike the aggravating circumstances that we're limited to by statute, the law, in an attempt to bend over backwards to help the defendant, says they can offer you any other aspect of the character, record and background of the Defendant, which they care to offer you. And in the face of that, the wide open door that says they can bring you anything, what have they brought you? That he was 19, that's it. I ask you to use your common sense and logic and draw what logical inference from that you will."
(R. 565-66.)
The appellant argues:
 "By asking the jury to draw the `logical inference' from the defense's failure to produce evidence of the appellant's good character and clean record, the prosecution is in essence alleging that he doesn't have one. Hence he is telling the jury that the Appellant has bad character and a prior criminal record."
(Appellant's brief, p. 40.)
We find no plain error in the cited portion of the prosecution's argument. We do not interpret the prosecution's comments to be a comment on the appellant's bad character or an indication that he has a prior criminal record; rather, the prosecution was simply commenting on lack of mitigating evidence. This is a proper subject of comment.
 "`[T]he impeachment of the evidence of defendant and the matter of impairment of its weight are properly matters for argument of counsel . . . .' Mosley v. State, 241 Ala. 132, 136, 1 So.2d 593, 595 (1941). `It is proper for counsel to disparage the case of his opponent if he speaks with propriety and does not go outside the record.' 23A C.J.S. Criminal Law § 1263 (1989)."
Taylor v. State, 666 So.2d at 65.
The appellant maintains that the prosecution also improperly commented on his character in the following portion of his argument:
 "[T]here's something I'm compelled to talk about that I despise having to talk about, because it has no business in this courtroom in this trial, or in any other trial.
 "Tuesday morning you would have thought you were in Chicago in 1970; disruptive, loud, obnoxious. `I'm not going to sit here for this system, I'm not going to put up with it,' a la Abbe Hoffman and the Chicago Seven and dozens of other people in dozens of other courtrooms in the late `60s and `70s. And that's where we thought we were. This is a throwback to those days.
 "Contrast that, folks, with what you've seen since then, the perfect demeanor. Why? I'm going to tell you why. It's *Page 606 
 because he got to say what he wanted to say, and that was `You're racist.'
 "Now, what is the real message of this, and why did he calm down after he got to say that? The real message here, folks, is this: `I'm black. Everybody down here is white. And if you sentence me to death, you're a race traitor.' That's the psychological subliminal message you're supposed to get out of that tantrum, that you're a bunch of racists. `And if you're white, if you sentence me to death, it's not because of what I did, it's because you're white and you're mistreating me because I'm black.' And that's the seed that he wants to plant in your minds, you're either a race traitor, an `Uncle Tom,' or you're a `white racist' who won't give a black man a fair shake."
(R. 566-68.) The trial court overruled the appellant's objection to the above comments.
The appellant argues that the above comments were improperly intended to portray him as a "bad person who dared to call [the members of the jury] racist, and who is attempting to use his race to get away with something." (Appellant's brief, p. 42.) We find no reversible error in the prosecution's comments. The appellant's behavior during the trial is the proper subject of comment by counsel. Bailey v. State, 625 So.2d 1182, 1183 (Ala.Cr.App. 1993); Cartwright v. State, 645 So.2d 326, 328 (Ala.Cr.App. 1994). (See Part III of this opinion for a discussion of the appellant's misconduct during trial.) Furthermore, when the allegedly inappropriate comments are viewed in the context of the entire closing argument, it is clear that the prosecution was encouraging the jury to base its sentencing recommendation on the evidence, and not to be intimidated by the appellant's behavior during trial.
 D.
We reject the appellant's assertion that the following portion of the prosecution's closing argument at the penalty phase of the trial constituted an improper comment on his failure to testify:
 "We've all dealt with remorse from people who have children or siblings or friends or neighbors who have done things wrong, beyond the point of mistakes, perhaps maliciously, `mean-spiritedness,' who later had a perk of their conscience and felt bad about it and apologized. `I'm sorry, what I did was wrong.' You've never heard one word like that, not one word. Because the only thing, the only thing that he's sorry about is that he sits right here."
(R. 571.) (Emphasis added to highlight the portion the appellant finds objectionable.)
During defense counsel's closing arguments, counsel argued:
 "And you know from listening to his statement, his confession to the Detroit police and to Sergeant Ken Glass, he offered no excuse or any reason at the time for doing this, just a confession. Why he confessed, we presented at our first close, feeling that maybe he wanted to get this off his chest."
(R. 557.)
 "I told you earlier that there was no, I think, excuse or justification for what Demetrius Frazier did. And I told you that he made a confession to both the Detroit Police Department and the Birmingham Police Department. I told you that to me should indicate that there's been a cleansing of the soul, that he has tried to right a wrong, in perhaps a small way. But, no, I dare say that nobody would ever know who actually killed Ms. Brown unless Demetrius [had] come forward. And I think that shows quite a lot.
 "And that's something very difficult to do, is to confess for no reason, just to admit twice that he had done what he did. And that was a, I submit to you, a *Page 607 
very difficult decision for someone his age."
(R. 560.)
When the allegedly objectionable comment is viewed in context, it is apparent that it was made in reply to defense counsel's intimation in closing argument that the appellant should be granted leniency because he confessed his crime to the police. Counsel has the right to respond to arguments by opposing counsel. Chandler v. State, 615 So.2d 100, 110 (Ala.Cr.App. 1992), cert. denied, 615 So.2d 111 (Ala. 1993) (Ingram, J., dissenting from denial of certiorari review). The prosecution was not commenting on the appellant's failure to testify, but rather on the appellant's lack of remorse when he confessed his crime to the authorities. This is the proper subject of comment. See Dobyne v. State, 672 So.2d 1319 (Ala.Cr.App.), on remand,672 So.2d 1353 (Ala.Cr.App. 1994), aff'd 672 So.2d 1354 (Ala. 1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996); Taylor v. State, 666 So.2d at 55.
 E.
The appellant suggests that the cumulative effect of all the above comments constitutes plain error. "`Because no single instance of alleged improper conduct constituted reversible error, this Court will not consider the cumulative effect to be greater error. McNeely v. State, 524 So.2d 375 (Ala.Cr.App. 1986); Johnson v. State, 541 So.2d 1112 (Ala.Cr.App. 1989).' Crymes v. State, 630 So.2d 120, 123-24 (Ala.Cr.App. 1993), aff'd,630 So.2d 125 (Ala. 1993)." Boyd v. State, 715 So.2d 825, 851
(Ala.Cr.App. 1997), aff'd, 715 So.2d 852 (Ala.), cert. denied,119 U.S. 416, 119 S.Ct. 416, 142 L.Ed.2d 388 (1998).
 VI.
The appellant alleges that the trial court committed reversible error during the penalty phase of the trial by charging the jury before the presentation of evidence and the arguments of counsel. We disagree.
The record reflects that after the jury returned its verdicts on Counts I and III of the indictment, and the trial court declared a mistrial on Count II of the indictment, a discussion ensued outside the presence of the jury regarding the aggravating and mitigating circumstances that counsel intended to rely upon. At the conclusion of the discussion, the trial court stated:
 "THE COURT: Well, Counselor, it's been my practice in the past to go ahead and instruct the jurors regarding the law in this respect before I allow presentation of the evidence, or argument, which seems to be the more logical way to do it, in my opinion. Can you comment about that?"
(R. 537.) Both the prosecution and defense counsel agreed to proceed in the manner proposed by the trial court. Counsel agreed to waive opening statements.
The jury returned to the courtroom, and the trial court gave complete and accurate instructions on sentencing in a capital case. There were no objections to the court's charge to the jury. The prosecution re-offered all of the evidence presented during the guilt phase of the trial, and defense counsel re-offered the testimony from the trial establishing that the appellant was 19 years old at the time of the crime. Defense counsel then presented their closing arguments, followed by the prosecution's closing argument.
At the conclusion of the prosecution's closing argument, the trial court determined that none of the jurors had questions and it then excused the jurors to begin deliberations. The trial court later dismissed the jurors for the evening. The record reflects that the jurors resumed their deliberations the next morning, and that they ultimately recommended, by a vote of 10-2, that the appellant be sentenced to death. *Page 608 
In James v. State, 723 So.2d 776 (Ala.Cr.App.), cert. denied,723 So.2d 786 (Ala. 1998), a capital murder case, this Court reversed the defendant's conviction because, we found, the trial court improperly admitted hearsay evidence; however, we also addressed the issue whether the trial court committed plain error in the penalty phase of the trial by charging the jury before the presentation of the evidence. This Court found that no plain error occurred in that regard. The facts pertaining to that issue are strikingly similar to the facts in the present case. We quote extensively from our opinion in James:
 "After a finding of guilty had been returned, the judge, the defendant, and counsel participated in a hearing outside the presence of the jury, discussing what the parties intended to present and argue during the sentencing phase. At the end of that hearing, the trial court announced:
 "`THE COURT: It's been my practice in the past to give the jury instructions before you begin your arguments and present any evidence which seems to be more logical to me so they'll understand the significance of what you're saying. Does anybody have any objection to that?
"`MR. WILKINSON [trial counsel]: No, sir.
 "`MR. ANDERTON [prosecutor]: No, sir. That's fine."
"(R. 544-54.)
 "When the jury returned, the trial court gave its complete instructions on sentencing in a capital case, including instructions on aggravating and mitigating circumstances, burden of proof, voting requirements, jury responsibility in sentencing, and the jury voting process. Neither counsel voiced any objections to the court's charge to the jury. Then, after both sides adopted the evidence presented during the guilt phase, counsel were allowed to present their closing sentencing arguments.
 "After the prosecutor ended his final argument, the trial court announced:
 "`THE COURT: All right, folks. I'm going to let you go back and begin your deliberations. We'll send the verdict forms back there. If you have any questions or if you want me to go over my instructions again, please let me know. I'll be glad to do that. Are there any questions at this point? Okay. Y'all go back and begin your deliberations, please.'
"(R. 586.)
 "Whereupon the jury began their deliberations and returned with a verdict of death, by a vote of 10-2.
 "By charging the jury on sentencing before counsel's arguments, the trial court violated the letter of Rule 21.1, Ala.R.Crim.P., which, in pertinent part, states:
 "`The court shall inform counsel of its proposed action upon [any written] requests [for jury instructions] prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed.'
"(emphasis added).
 "James argues that this violation of Rule 21.1, Ala.R.Crim.P., constituted reversible error. We do not agree that reversible error occurred in this case but we write to express our belief that a trial court can indeed commit reversible error by not complying with the clear requirements of Rule 21.1, Ala.R.Crim.P.
 "This Court must review the jury instructions given by a trial court as a whole. Land v. State, 678 So.2d 201, 222 (Ala.Cr.App. 1995), aff'd, 678 So.2d 224 (Ala. 1996), cert. denied, 519 U.S. 933, 117 S.Ct. 308 136 L.Ed.2d 224 (1996). The instructions in this case accurately stated the principles of law, the issues, and responsibilities of the jury. As we noted above, trial counsel did not object to this violation of the rule, nor did he complain after the instructions were given, nor did he request *Page 609 
 any additional instructions at the close of arguments. The trial court gave the jury the opportunity to ask questions and to request additional instructions at the end of arguments and before beginning its deliberations, and the jury was apparently satisfied with their earlier instructions. We particularly note that there was no great time lapse between the trial court's instructions and the jury's deliberations. Considering all these circumstances, we cannot say that the appellant was prejudiced by the sequence of the trial court's sentencing instructions. There is no plain error here.
 "While we do not find error in this particular case, we do not condone the practice of charging the jury, especially in a capital murder case, before the arguments of counsel, in either the guilt or sentencing phase of trial. We understand that preliminary instructions can often be helpful for jurors, and we commend the trial judge for taking the time to educate the jury about its duties and the basic principles of law it would apply in its deliberations. However helpful preliminary instructions may be, though, they cannot serve as a substitute for a complete jury charge, as the rule requires, after counsel have completed their arguments. A final jury charge gives the trial court the last opportunity to be heard. It focuses the jury on the law, the evidence, and its responsibilities, and also allows the jury a time to recover from the purely emotional aspects of counsel's arguments prior to its deliberations.
 "If a trial court believes preliminary instructions should be given to assist the jury in understanding the legal process, Rule 21.1 requires the judge to also give comprehensive jury instructions after closing arguments, even at the cost of extensive repetition. See Blandburg v. State, 209 Ga. App. 752, 754, 434 S.E.2d 510, 512
(Ga.Ct.App. 1993). To disregard the mandatory requirements of Rule 21.1, Ala.R.Crim.P., is to straddle a fine line between harmless and reversible error."
723 So.2d at 786.
Based on the rationale set forth in James, we conclude that the trial court did not commit plain error in this case by instructing the jury before the presentation of the evidence and arguments of counsel.
We recognize that the Alabama Supreme Court, in denying the state's petition for certiorari review in James, expressed disapproval of the practice of a trial court's charging the jury in full before the presentation of evidence and the arguments of counsel. See James v. State, 723 So.2d 786, 786 (Ala. 1998). However, the issue whether it is plain error for a trial court to fully charge a jury prior to the presentation of evidence and arguments of counsel was not presented by the state's request for certiorari review; the Court's expression of disapproval was not necessary to the resolution of the issues raised on appeal. Accordingly, we consider the court's expression of disapproval to be dicta and not binding precedent.
 VII.
Section 13A-5-53, Code of Alabama 1975, mandates that in addition to reviewing the case for any error involving the appellant's capital murder conviction, this Court must review the propriety of the death sentence.
 "This review shall include the determination of whether any error adversely affecting the rights of the defendant was made in the sentence proceedings, whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence, and whether death was the proper sentence in the case."
Section 13A-5-53(a).
Pursuant to Rule 45A, Ala.R.App.P., we have searched the entire record for any error that may have adversely affected the appellant's substantial rights, whether or *Page 610 
not brought to our attention or to the attention of the trial court. We find no plain error in either the guilt phase or in the sentencing phase of the proceedings.
In its written sentencing order, the trial court found the existence of one aggravating circumstance: that the murder was committed while the appellant was engaged in the commission of a robbery or an attempt thereof. § 13A-5-49(4), Code of Alabama 1975. The trial court found the existence of one statutory mitigating circumstance: that the appellant was 19 years old at the time of the crime. § 13A-5-51(7), Code of Alabama 1975. The trial court found no nonstatutory mitigating factors.[3]
The trial court's findings reflect that it carefully weighed the aggravating circumstance and the mitigating circumstance before sentencing the appellant to death. The trial court's findings are supported by the record.
Accordingly, because we found no plain error in either the guilt or the sentencing phase of the appellant's trial relating to his capital murder conviction, and because we find that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the record, we must now determine whether death was the proper sentence. § 13A-5-53(a), Code of Alabama 1975. In so doing, § 13A-5-53(b), requires this Court to determine:
 "(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
 "(2) Whether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence; and
 "(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
We find no evidence that the appellant's sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. Our independent weighing of the aggravating and mitigating circumstances indicates that death is the proper sentence. Last, considering both the crime committed and the appellant, we find that the appellant's sentence is neither excessive nor disproportionate to the penalty imposed in similar cases. Indeed, "two-thirds of Alabama's death sentences have been imposed on defendants convicted of capital murder arising out of robbery-murder." McNair v. State, 706 So.2d at 845.
For the foregoing reasons, the appellant's capital murder conviction under Count I of the indictment and his resulting sentence of death by electrocution are due to be and are hereby affirmed. However, as discussed in Part I of this opinion, the appellant's conviction for intentional murder under Count III of the indictment is reversed, and this cause is remanded to the trial court with directions to vacate its judgment as to that conviction.
 AFFIRMED AS TO CONVICTION AND SENTENCE IMPOSED PURSUANT TO COUNT I; REVERSED AS TO CONVICTION AND SENTENCE IMPOSED PURSUANT TO COUNT III OF THE INDICTMENT; AND REMANDED. *Page 611 
Long, P.J., and McMillan and Baschab, JJ., concur; Cobb, J., recuses.
[1] See also § 15-16-22, Code of Alabama 1975, which provides, in relevant part:
 "(a) Whenever it shall be made known to the presiding judge of a court by which an indictment has been returned against a defendant for a capital offense, that there is reasonable ground to believe that such defendant may presently lack the capacity to proceed or continue to trial, as defined in Section 22-52-30, or whenever said judge receives notice that the defense of said defendant may proceed on the basis of mental disease or defect as a defense to criminal responsibility; it shall be the duty of the presiding judge to forthwith order that such defendant be committed to the Department of Mental Health and Mental Retardation for examination by one or more mental health professionals appointed by the Commissioner of the Department of Mental Health and Mental Retardation . . . ."
(Emphasis added.)
[2] Both the victim and the appellant in this case were black.
[3] In the appellant's brief to this court, in Issue VI, he requested that this Court remand this cause to the trial court with instructions that the trial court enter a written sentencing order in compliance with § 13A-5-47(d), Code of Alabama 1975. The state agreed that the cause was due to be remanded for that reason. After the respective parties' briefs were filed with this Court, a supplemental record, which contains the trial court's written findings, was filed with this Court. Accordingly, we consider the appellant's assertion to be moot.
We note that although the trial court referenced the pre-sentence report in the sentencing hearing and in its written findings, the presentence report was not initially contained in the record on appeal. Pursuant to this Court's order, the record has been supplemented with the pre-sentence report.