Rel: March 28, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2024-2025

_____

## CR-2023-0721
_____

## Brandon Deshawn Webster

## v.

## State of Alabama

## Appeal from Montgomery Circuit Court
## (CC-22-148)

COLE, Judge.

Brandon Deshawn Webster appeals his convictions for capital murder for killing Tanisha Pughsley while a valid protective order was in place, a violation of § 13A-5-40(a)(19), Ala. Code 1975; capital murder for killing Pughsley during a first-degree burglary, a violation of § 13A-

5-40(a)(4), Ala. Code 1975; and attempted first-degree assault of Jeremy Walker, a violation of § 13A-4-2 and § 13A-6-20(a)(1), Ala. Code 1975; and his resulting concurrent sentences of life imprisonment without the possibility of parole for each of his capital-murder convictions and 10 years' imprisonment for his attempted-first-degree-assault conviction.

<u>Facts and Procedural History</u>

In 2019, Pughsley and Walker, both members of the Montgomery Police Department, met through a mutual friend, Michael Westbrook. They began "talking" between April and June 2020. On July 5, 2020, Pughsley and Walker went on a date to Birmingham before returning to Pughsley's residence in Montgomery at some point after 1:00 a.m. on July 6, 2020. During an interview with Walker, which was admitted into evidence as State's Exhibit 6, Walker stated that Pughsley had told him that Webster, her ex-husband, had been physically abusive and that she had put a restraining order on Webster. Thus, upon returning to Pughsley's residence, which she previously had shared with Webster, Pughsley told Walker to park away from her house in the nearby cul-de-sac because Webster might drive by the house.

Around 2:00 a.m. on July 6, 2020, Walker heard a gunshot and then the burglar alarm went off because a door was opened. Both Pughsley and Walker pushed the bedroom door to keep it closed, but Webster fired two shots through the door. Walker fell back onto the bed while Pughsley fell back "towards the sofa" in the bedroom. Once Webster entered the bedroom, he pointed his gun at Walker before Webster and Walker began to struggle over the gun. Eventually, Walker gained control over the gun and threw it "into the bathroom." (R. 269.) Walker fled the house through the front door after Pughsley told him to run. Walker denied that Pughsley had been shot before he left the house, and he did not hear any gunshots after he left Pughsley's house. Once outside, Walker knocked on the doors of three to five neighboring houses, but no one answered. Walker, thereafter, fled on foot to Westbrook's house, which was almost three miles away.

Walker fled Pughsley's house in only his underwear, leaving his clothes, telephone, and keys behind. Pughsley had told Walker that Webster drove a gold-colored Cadillac sedan with rims, which Walker saw parked in front of his vehicle in the cul-de-sac when he fled Pughsley's house. While Walker had never formally met Webster,

3

Walker had seen Webster with Pughsley at Westbrook's house once before in 2019. Walker described Webster as being about his height, dark skinned, heavy set, and with a beard.

An emergency 911 call was made at approximately 2:11 a.m. on July 6, 2020. The caller stated that someone had called him informing him that a shooting had occurred at Pughsley's residence. See State's Exhibit 15. The caller further explained that he was not there and did not know what had occurred but mentioned that his ex-wife may have been there. Finally, the caller identified himself as "Rodney" and indicated that he thought, but did not know, that someone had been shot. That call was the only 911 call received regarding the shooting; however, there was one alarm-company 911 call and "maybe two more" alarm-company calls. The cellular-telephone number of the 911 caller was recorded, and that same number was listed as Webster's telephone number with Saddleback Ridge apartments, which is where Webster lived. Law-enforcement officers arrived at Pughsley's house at 2:29 a.m. and found the back door open. They located Pughsley, shot in the chest and hip, in the bedroom at approximately 2:33 a.m.

Officer David Stewart, a patrol officer with the Montgomery Police Department, was one of the first officers to respond to the scene. Officer Stewart's body-camera footage was admitted into evidence, as State's Exhibit 16, over Webster's objection. Officer Stewart found Pughsley's back door ajar upon his arrival, and he was unable to hear Pughsley's burglar alarm until he entered the residence. Officer Stewart, along with another officer, located Pughsley in the master bedroom and performed medical assistance until medical personnel arrived.

Marvia Scott, one of Pughsley's neighbors, provided video-camera footage from her house showing Walker fleeing the neighborhood. Scott called the police after seeing Walker fleeing through her yard, but she denied hearing anyone knock on her door or gunshots. Video-camera footage from both Chance Webster ("Chance") and Fred Judkins, which showed the traffic flowing through Pughsley's neighborhood around the time of the shooting, was admitted into evidence. Chance's video-camera footage showed a gold-colored Cadillac sedan driving into Pughsley's neighborhood at approximately 2:03 a.m. and leaving the neighborhood at approximately 2:06 a.m. Additionally, Chance's video-camera footage showed the gold-colored Cadillac sedan come back into the neighborhood

with its lights off at approximately 2:11 a.m. and leaving the neighborhood again at 2:16 a.m. Judkins's video-camera footage covered Saddleback Ridge apartments, the same apartment complex where Webster resided. A gold-colored Cadillac sedan can be seen entering and leaving the Saddleback Ridge apartment complex around the same time as depicted in Chance's video.[1]

Terrence Bowens, an officer with the Montgomery Police Department, heard that Pughsley had been shot while he was with his dating partner, Detective Usen,[2] who was also with the Montgomery Police Department. After hearing about Pughsley, Officer Bowens proceeded to Pughsley's residence even though he was not on duty, but he was not able to get on scene. Thereafter, Officer Bowens proceeded to Westbrook's house.[3] When Officer Bowens arrived, he told Westbrook that Pughsley "had possibly been hurt or shot." (R. 439.) Westbrook

---

[1]The time stamps of the videos were not accurate with each other because they were not synchronized.

[2]Detective Usen's first name does not appear in the record.

[3]In 2020, Westbrook was an officer with the Montgomery Police Department and was close friends with Pughsley. (R. 438.) However, at the time of trial, Westbrook was no longer employed with the Montgomery Police Department.

"broke down and left the house" to see what he could do to assist Pughsley. (R. 439.) Officer Bowens proceeded to go home but turned around after he received a call from Westbrook. When Officer Bowens returned to Westbrook's house, Walker was present.

On July 6, 2020, Westbrook, then an officer with the Montgomery Police Department, was not on duty. Westbrook testified that Officer Bowens came to his house on July 6, 2020, and told him about Pughsley being shot. Thereafter, Westbrook left his house to go to Pughsley's residence to see what he could do to assist. Halfway to Pughsley's residence, Westbrook turned around because he got a camera notification on his cellular telephone that showed Walker "naked, sweating, drenched in sweat" at his house trying to get his attention through the camera. (R. 452-53.) Westbrook attempted to calm Walker and got Walker some clothes to wear. Finally, Westbrook called Officer Bowens to find out who was the supervisor on duty, and then "a few units came and took [Westbrook] and [Walker] down to the detectives division." (R. 455.)

Detective S. Agosto, with the Montgomery Police Department, testified that she, along with Detective R.B. Dabney, were the crime-scene investigators for the shooting at Pughsley's residence. Only one

7

"spent [.223] shell casing" was located at the scene -- found in the living room area. (R. 491.) However, the bedroom door had three gunshot holes. It was determined that at least one projectile "came from inside the [bed]room," striking a wall before going "through the laundry room and out [of] the residence." (R. 494-95.) Based on the blood evidence and an indention in the concrete below the carpet, it was determined that Pughsley had been shot in the corner of the master bedroom.

Dr. Edward Reedy, the chief medical examiner with the Alabama Department of Forensic Sciences ("the ADFS"), testified as an expert in the field of forensic pathology. Dr. Reedy did not perform Pughsley's autopsy,[4] but he "conducted a second peer review" of Pughsley's autopsy and came to his own opinions. (R. 672-74.) Dr. Reedy's independent opinion reached the same conclusions as those found in the original autopsy report. Based upon the stippling seen on Pughsley's arms and chest, Dr. Reedy opined that when Pughsley was shot "the muzzle of the weapon was around two feet away from" her. Moreover, Dr. Reedy opined

---

[4]Dr. Christopher Geffre conducted Pughsley's autopsy; however, at the time of trial, Dr. Geffre was no longer employed with the ADFS. Dr. Geffre's autopsy results were initially peer-reviewed by Dr. Stephen Boudreau; however, at the time of trial, Dr. Boudreau was deceased.

8

that the trajectory of the gunshot was "downward." Pughsley's death was caused by the gunshot wound passing through her left lung and aorta artery. While death would not have been immediate, Dr. Reedy opined that death "would have been very rapid." (R. 694-95.)

Detective Brian Goza, with Montgomery Police Department at the time of the offense, testified to examining Pughsley's cellular telephone. Several text messages and email exchanges between Pughsley and Webster were introduced, showing Webster's aggressive behavior toward Pughsley. Sergeant Greg Schnupp, also with the Montgomery Police Department, testified to searching Webster's apartment at Saddleback Ridge apartments. In Webster's bedroom, "an AR magazine" was located "on top of the dresser." (R. 801.) In the top left drawer of the dresser, Sergeant Schnupp located a copy of the protective order. Sergeant Schnupp also searched Webster's vehicle. In the trunk of Webster's vehicle, Sergeant Schnupp located "an[other] AR magazine." Also located in Webster's vehicle was "a badge belonging to … Pughsley." (R. 811.) No ammunition was located either at Webster's apartment or in his vehicle. However, Michael Dugan, a firearm and tool-marks specialist with the ADFS, testified that the spent .223 shell casing found at

9

Pughsley's residence would fit into the magazines located in Webster's apartment and vehicle.

Webster did not testify in his own defense and presented only one witness, Reginald K. Dabney, a homicide detective who had worked for the Montgomery Police Department in 2020. Detective Dabney interviewed Walker after the shooting. Through Detective Dabney, Webster attempted to show that Walker was unreliable.

Thereafter, the jury convicted Webster of two counts of capital murder and one count of attempted first-degree assault of Walker, a lesser-included offense of attempted murder. The trial court sentenced Webster to concurrent sentences of life imprisonment without the possibility of parole for each capital-murder conviction and to 10 years' imprisonment for the attempted-first-degree-assault conviction. This appeal followed.

<u>Discussion</u>

On appeal, Webster raises six arguments: (1) whether the trial court erred in finding that sufficient evidence existed to convict and whether the weight of the evidence was sufficient; (2) whether his right to confront his accusers was violated when the autopsy doctor was not

available to testify; (3) whether the trial court erred in not making a competency determination; (4) whether the trial court erred in admitting the body-camera footage depicting Pughsley's death; (5) whether the trial court erred in admitting prior statements made by Webster; and (6) whether the trial court erred when it instructed the jury on intent. None of these issues entitles Webster to relief.

## I.    Sufficiency and Weight of the Evidence

Webster argues on appeal that the sufficiency and weight of the evidence do not support his convictions for capital murder and for attempted first-degree assault. Specifically, Webster argues that "no physical evidence … support[ed] Walker's claim that Pughsley was shot after he left the home," which, he says, showed that his version of events (that Pughsley was shot accidentally during the struggle for the gun) was more credible. (Webster's brief, pp. 8-9.) This fact alone, Webster says, "negates [his] guilt on all three convictions" because there was doubt as to his intent. (Webster's brief, p. 9.)

We first note that, as the State asserts, Webster failed to preserve for appellate review his argument regarding the weight of the evidence. A defendant can preserve an argument about the weight of the evidence

11

by filing a timely motion for a new trial stating "that the verdict is contrary to law or the weight of the evidence." See Zumbado v. State, 615 So. 2d 1223, 1241 (Ala. Crim. App. 1993); Rule 24.1(c)(1), Ala. R. Crim. P. Webster did not file any motion for new trial, nor did he raise his weight-of-the-evidence argument to the trial court. Therefore, this issue is not preserved for appellate review. Webster, thus, is due no relief on this claim.

Regarding Webster's sufficiency argument, both at the conclusion of the State's case-in-chief and at the close of the evidence, Webster moved for a judgment of acquittal based on the State's failure to present a prima facie case as to each count charged in the indictment. Those motions were denied. Webster's motion for judgment of acquittal as to the charges of capital murder while a valid protective order was in place and capital murder during a first-degree burglary preserved his arguments on appeal. However, as the State asserts, because Webster challenged the sufficiency of the evidence only as it related to his charge of attempted murder, his motion for judgment of acquittal failed to preserve for appellate review his argument as to the lesser-included offense of attempted first-degree assault. See Jones v. State, 895 So. 2d

376, 379 (Ala. Crim. App. 2004) (finding motion for judgment of acquittal attacking indicted offense, but not the lesser-included offense, failed to preserve the sufficiency-of-the-evidence challenge as to the lesser-included offense). Thus, Webster failed to preserve for appellate review the sufficiency-of-the-evidence argument as to his attempted-first-degree-assault conviction.

Thus, we turn to the merits of whether the State presented sufficient evidence to support Webster's convictions for capital murder while a valid protective order was in place and capital murder during a first-degree burglary.

> "'"In determining the sufficiency of the evidence to sustain [a] conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution." Faircloth v. State, 471 So. 2d 485, 489 (Ala. Crim. App. 1984), affirmed, Ex parte Faircloth, [471] So. 2d 493 (Ala. 1985).'

"White v. State, 546 So. 2d 1014, 1017 (Ala. Crim. App. 1989)."

Tate v. State, 305 So. 3d 254, 257 (Ala. Crim. App. 2019).

A. Capital Murder While a Valid Protective Order Was In Place

To convict Webster of capital murder while a valid protective order was in place, the State had to prove that: (1) Pughsley was dead; (2)

13

Webster caused Pughsley's death after a court issued a valid protective order against Webster pursuant to § 30-5-1 et seq., Ala. Code 1975; (3) the protective order was still in place at the time of Pughsley's death; and (4) Webster intended to kill Pughsley. § 13A-5-40(a)(19), Ala. Code 1975. Webster's argument on appeal challenges only the last element -- whether Webster had the intent to kill Pughsley. (Webster's brief, pp. 6-9.)

Both the State and Webster stipulated, before the trial, that on June 19, 2020, Pughsley had applied for and been granted a protective order that restrained Webster from "having physical or violent contact" with Pughsley, her residence, or her place of employment. (R. 219-21.) That protective order was in place until December 19, 2020. Thus, the State, through the stipulation, provided sufficient proof that a valid protective order had been issued against Webster and was still in place at the time of Pughsley's death. The State also presented sufficient proof that Pughsley was deceased and that Webster caused her death.

Regarding the issue of intent, § 13A-2-2(1), Ala. Code 1975, states that "[a] person acts intentionally with respect to a result or to conduct

14

described by a statute defining an offense, when his purpose is to cause

that result or to engage in that conduct."

> "This Court has repeatedly observed that intent is a state of mind that is rarely, if ever, established by direct evidence and must be inferred from the facts. E.g., Chambers v. State, 181 So. 3d 429, 434 (Ala. Crim. App. 2015); Morton v. State, 154 So. 3d 1065, 1080 (Ala. Crim. App. 2013); Brown v. State, 11 So. 3d 866, 914 (Ala. Crim. App. 2007).
>
>> "'Intent may be inferred from the use of a deadly weapon. See Long v. State, 668 So. 2d 56, 60 (Ala. Crim. App. 1995); Buskey v. State, 650 So. 2d 605, 609 (Ala. Crim. App. 1994). Additionally, "[t]he question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve." Rowell v. State, 570 So. 2d [848,] 850 [(Ala. Crim. App. 1990)], citing Crowe v. State, 435 So. 2d 1371, 1379 (Ala. Crim. App. 1983). Intent may be "'inferred from the character of the assault, the use of deadly weapon and other attendant circumstances.'" Jones v. State, 591 So. 2d 569, 574 (Ala. Crim. App. 1991), quoting Johnson v. State, 390 So. 2d 1160, 1167 (Ala. Crim. App. 1980).'
>
> "Waldrop v. State, 859 So. 2d 1138, 1162 (Ala. Crim. App. 2000), aff'd, 859 So. 2d 1181 (Ala. 2002)."

Henderson v. State, 248 So. 3d 992, 1007-08 (Ala. Crim. App. 2017).

Here, Webster entered Pughsley's house around 2:00 a.m. armed

with a loaded gun. Webster proceeded to fire two shots through the

master-bedroom door that both Pughsley and Walker were pushing

15

against to keep closed. Upon entering the master bedroom, Webster pointed the gun at Walker and a struggle over the gun ensued. Once Walker wrestled the gun away from Webster, Walker threw the gun into the bathroom and fled when Pughsley told him to run. Walker testified that, when he left Pughsley's house, Pughsley had not been shot. When law-enforcement officers arrived, they found Pughsley in the corner of the master bedroom with a gunshot wound to the chest struggling to breathe. The blood evidence, bullet damage to the concrete floor, and Dr. Reedy's testimony all indicated that Pughsley was shot while she may have been in a crouched position and that the shot was fired from no more than two feet away. That evidence was sufficient for a jury to conclude that Webster killed Pughsley and that he acted with the intent to kill. Any contradictions in the evidence go to the weight of the evidence, not the sufficiency of the evidence, and were for the jury to decide. Webster is due no relief on this claim.

### B. Capital Murder During a First-Degree Burglary

To convict Webster of capital murder during a first-degree burglary, the State had to prove that: (1) Pughsley was dead; (2) Webster killed Pughsley and acted with intent; (3) Webster knowingly and unlawfully

16

entered or remained unlawfully in Pughsley's house; (4) in entering Pughsley's house, Webster intended to commit a crime -- assault or murder; and (5) while in Pughsley's house, Webster caused physical injury to a person, Pughsley or Walker, or, while in Pughsley's home or in immediate flight therefrom, Webster used or threatened the use of a deadly weapon, a gun, against another person, Pughsley or Walker. § 13A-5-40(a)(4), Ala. Code 1975; § 13A-6-2(a)(1), Ala. Code 1975; § 13A-7-5(a)(2) and (3), Ala. Code 1975. Again, Webster's argument on appeal challenges only the second element -- whether Webster had the intent to kill Pughsley.

Because Webster does not challenge the other elements of capital murder during a first-degree burglary, this Court will address only the element of "intent" that Webster contests. As discussed in Part I.A. above, § 13A-2-2(1), Ala. Code 1975, defines when a person acts intentionally. Intent is rarely established by direct evidence and thus is inferred from the facts. Henderson, 248 So. 3d at 1007-08. The use of a deadly weapon, the character of an assault, or other attendant circumstances may provide the necessary inference to show an accused's intent. Id. The same set of facts and circumstances found in Part I.A. to

establish the intent for capital murder while a valid protective order was in place also establishes the intent element for capital murder during a first-degree burglary. Thus, the State presented sufficient evidence to establish that Webster committed capital murder during a first-degree burglary, and Webster is due no relief on this claim.

## II.    Confrontation

Webster also argues that his right to confront his accusers was violated. Specifically, Webster argues that his right of confrontation, as guaranteed by the Sixth Amendment to the United States Constitution, was denied because Dr. Reedy testified to Pughsley's autopsy results, but the autopsy and the autopsy report were conducted and written by Dr. Christopher Geffre. See note 4, supra. Webster concedes in his brief that this issue was not objected to at trial, but he requests this Court to find plain error on this issue.

This issue was not preserved for appellate review, and the plain-error doctrine does not apply. This Court has repeatedly held that "[p]lain error review does not apply to convictions in which the death penalty has not been imposed." Hicks v. State, 378 So. 3d 1071, 1130 (Ala. Crim. App. 2019); see Keaton v. State, 375 So. 3d 44, 71 (Ala. Crim.

18

App. 2021). The death penalty was not imposed in this case, and Webster did not object or otherwise present his confrontation claim to the trial court. Thus, Webster failed to preserve this issue for appellate review.

Even if Webster had preserved this issue, which he did not, he would still not be entitled to relief. This Court has previously held that "'it [is] not a violation of the Confrontation Clause to admit an autopsy report without the medical examiner's testimony' because 'autopsy reports are nontestimonial in nature.'" Henderson v. State, [Ms. CR-21-0044, May 3, 2024] __ So. 3d __, __ (Ala. Crim. App. 2024). Moreover, violations of the Confrontation Clause are subject to a harmless-error analysis. Id.

Here, Dr. Reedy testified that he did not personally conduct Pughsley's autopsy. (R. 672.) But Dr. Reedy did "conduct[] a second peer review" of the original autopsy, which required "a review of the investigative information and the autopsy photographs." (R. 674.) After conducting the peer review, Dr. Reedy "generate[d] [his] own opinions as to where the bullet entered, where the bullet exited, the wound path, and injuries that may have occurred between the entrance and exit" wounds. (R. 674.) When Dr. Reedy compared his own opinions to the original

autopsy report, Dr. Reedy found that his own opinions were the same as Dr. Geffre's opinions contained in the autopsy report. (R. 674-75.) Thus, Dr. Reedy was subject to cross-examination and did not simply recite conclusions from the autopsy report but provided his own opinions that happened to be cumulative to those in the autopsy report. See, e.g., Henderson, __ So. 3d at __ (Ala. Crim. App. 2024) (finding that the doctor's own opinions were cumulative to those in the autopsy report, making any error in admission of evidence harmless because the evidence was cumulative). Additionally, it was undisputed that Pughsley's death was caused by a gunshot wound; the dispute was whether the gunshot was intentional or accidental. This evidence, thus, was not critical to the State's case. For all these reasons, Webster is not entitled to relief.

## III. Competency

Webster next argues that the trial court erred when it failed to order that he undergo a mental evaluation to determine whether he was competent to stand trial. Specifically, relying on Rule 11, Ala. R. Crim. P., and § 15-16-22, Ala. Code 1975, Webster argues that the trial court should have ordered that he undergo a mental evaluation to determine

his competency to stand trial based on his pleas of not guilty and not guilty by reason of mental disease or defect made at his arraignment.

Rule 11.2(a)(1), Ala. R. Crim. P., states that "[w]hen a person charged with a crime is before a circuit court, the defendant, the defendant's attorney, or the district attorney may petition for, or the court on its own motion may order, an examination to assist in the determination of the defendant's present mental condition and competency to stand trial." Section 15-16-22(a), Ala. Code 1975, provides in pertinent part:

> "Whenever it shall be made known to the presiding judge of a court by which an indictment has been returned against a defendant for a capital offense, that there is reasonable grounds to believe that such defendant may presently lack the capacity to proceed or continue to trial, as defined in Section 22-52-30[, Ala. Code 1975], or whenever said judge receives notice that the defense of said defendant may proceed on the basis of mental disease or defect as a defense to criminal responsibility; it shall be the duty of the presiding judge to forthwith order that such defendant be committed to the Department of Mental Health and Mental Retardation for examination by one or more mental health professionals appointed by the Commissioner of the Department of Mental Health and Mental Retardation …."

The Alabama Supreme Court has found that, "[w]hen read together, Rule 11.2(a) and § 15-16-22 stand for the proposition that a judge presiding over a capital case has a duty to order the defendant to submit to an

21

examination to determine the defendant's competency to stand trial when the judge has reasonable grounds to believe that the defendant may lack the competency to stand trial." Ex parte Cate, 134 So. 3d 870, 875 (Ala. 2013). Additionally,

> "[a] defendant's '"competency to stand trial refers to a defendant's current mental state and functional capacities as they relate to a pending trial process."' Committee Comments on Rule 11.1, quoting T. Grisso, Evaluating Competencies.
>
> > "'"Ala. Code 1975, § 15-16-21, provides in pertinent part:
> >
> > > "'"'If any person charged with any felony is held in confinement under indictment and the trial court shall have reasonable grounds to doubt his sanity, the trial of such person for such offense shall be suspended until the jury shall inquire into the fact of such sanity....'
> >
> > "'"This section authorizes the trial court to make a preliminary determination (without the aid of a jury) as to whether there are reasonable grounds to doubt the defendant's competency to stand trial. Ex parte LaFlore, 445 So. 2d 932, 934 (Ala. 1983); Richardson v. State, 354 So. 2d 1193, 1196 (Ala. Crim. App. 1978). The trial court is, thus, the

22

'screening agent' for mental examination requests. <u>Livingston v. State</u>, 419 So. 2d 270, 274 (Ala. Crim. App. 1982)."

"'<u>Reese v. State</u>, 549 So. 2d 148, 150 (Ala. Crim. App. 1989), overruled on other grounds, <u>Huntley v. State</u>, 627 So. 2d 1013 (Ala. 1992). "It is left to the discretion of the trial court as to whether there is a reasonable doubt or bona fide doubt as to sanity and, thus, whether a further examination is required." <u>Waldrop v. State</u>, 459 So. 2d 953, 955 (Ala. Crim. App. 1983), aff'd, 459 So. 2d 959 (Ala. 1984), cert. denied, 471 U.S. 1030, 105 S. Ct. 2050, 85 L. Ed. 2d 323 (1985). The standard of review is whether the trial court abused its discretion by not requiring an evaluation of [a defendant]'s competency to stand trial. <u>See</u> <u>Baker v. State</u>, 599 So. 2d 60, 62 (Ala. Crim. App. 1991).

"'A trial of an accused who is incompetent violates due process. <u>Wagner v. State</u>, 489 So. 2d 623, 628 (Ala. Crim. App. 1985); <u>Bishop v. United States</u>, 350 U.S. 961, 76 S. Ct. 440, 100 L. Ed. 835 (1956). Rule 11.1, Ala. R. Crim. P., states:

"'"A defendant is mentally incompetent to stand trial or to be sentenced for an offense if that defendant lacks sufficient present ability to assist in his or her defense by consulting with counsel with a reasonable degree of rational understanding of the facts and the legal proceedings against the defendant."

23

"'The trial court makes the ultimate determination of a defendant's competency pursuant to the following standard:

"'"The test for determining competency to stand trial is whether the defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him.' Dusky v. United States, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960); Drope v. Missouri, 420 U.S. 162, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975)."

"'Anderson v. State, 510 So. 2d 578, 579 (Ala. Crim. App. 1987). "This determination [of competency to stand trial] should be left to the discretion of the trial court." Baker v. City of Huntsville, 516 So. 2d 927, 931 (Ala. Crim. App. 1987).'

"Russell v. State, 715 So. 2d 866, 868-69 (Ala. Crim. App. 1997). (Emphasis added.)"

Frazier v. State, 758 So. 2d 577, 585-86 (Ala. Crim. App. 1999) (footnote omitted).

Here, an order entered by the trial court indicates that Webster pleaded not guilty and not guilty by reason of mental disease or defect at his arraignment, but a transcript of the arraignment is not included in the record on appeal. After his plea, Webster never moved for any mental

24

evaluation, never requested funds for an expert, and never pursued a defense that he was incompetent to stand trial. In fact, the only evidence that Webster points this Court to regarding evidence of mental incompetency is that, during the trial testimony of his sister, Tatyana Webster ("Tatyana"), Tatyana testified that she overheard Webster say -- after learning of Pughsley's death -- that "he was going to kill his self." (R. 563.) Webster's statement was made on July 6, 2020; however, Webster's trial did not occur until August 15, 2023. There is no indication that Webster was still suffering from suicidal ideations at the time of trial. See Cook v. State, 64 So. 3d 672, 674-75 (Ala. Crim. App. 2010) (noting that there must be some evidence before the trial court to call into doubt an accused's sanity before a mental evaluation is warranted). Moreover, suicidal ideations alone are not "conclusive evidence of a defendant's inability to understand the nature of the proceedings against him and to aid in his own defense." Reese v. State, 549 So. 2d 148, 150 (Ala. Crim. App. 1989), overruled on other grounds in Huntley v. State, 627 So. 2d 1013 (Ala. 1992). There is no indication from the record that Webster was suffering from any mental deficiencies at the time of trial. The fact that Webster may have had suicidal ideations three years before

his trial does not show that Webster was mentally incompetent at the time of trial. Webster's failure to raise this issue before the trial court, other than by his initial pleas, also militates against finding that Webster was suffering any mental deficiency at the time of trial. Given these circumstances, the trial court did not abuse its discretion in not ordering a mental evaluation to determine Webster's competency to stand trial. Webster is, thus, due no relief.

## IV.   Body-Camera Footage

Webster next argues that the trial court erred when it denied his motion to exclude the audio of the body-camera footage depicting Pughsley's death. Specifically, Webster argues that the audio of the body-camera footage, which was admitted into evidence as State's Exhibit 16, "served no purpose other than to inflame the jury and was particularly gruesome" such that it should have been excluded. (Webster's brief, p. 16.)

Prior to the trial, Webster filed a motion in limine seeking to redact the body-camera footage he believed the State intended to introduce at the trial. Specifically, Webster argued that the body-camera footage contained "hearsay and other inadmissible statements" made by law-

26

enforcement officers and other third parties. (C. 322-24.) Webster also argued that the body-camera footage depicted Pughsley "still 'twitching' and 'moaning' prior to her death," which he argued was cumulative to other evidence -- photographs -- the State intended to introduce at trial. (C. 322-24.) The trial court denied Webster's motion.

During the trial, Webster argued that the body-camera footage showed Pughsley being found alive, that Pughsley made no statements, and that she only moaned. Specifically, Webster argued that the prejudice substantially outweighed any probative value of the footage because Pughsley does not say who shot her. Webster argued that the State could prove where Pughsley was found with photographs from the body-camera footage but that Webster's "problem [with the footage] is with the audio portion." (R. 371.) The State argued that it had "the burden of proving that [Pughsley] was alive and that [Pughsley] died" and that the footage depicting her death was "an essential element" of the proof needed to convict Webster. (R. 372-73.) The State also argued that the body-camera footage, including its audio, was relevant for other purposes as well. Specifically, the State argued that the purpose of the footage was to counter Webster's theory that the shooting was an

27

accident or that law-enforcement officers manipulated evidence. Thus, the State argued that admitting the footage without the audio would allow Webster to continue to advance his theory without contradiction. In response, Webster argued he was "not asking [that] the entire audio … be redacted" but only that the audio of Pughsley dying be redacted. (R. 374-77.) After hearing the arguments, the trial court overruled Webster's objection.

This Court has repeatedly said:

"'Generally, photographs are admissible into evidence in a criminal prosecution "if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge."' Bankhead v. State, 585 So. 2d 97, 109 (Ala. Crim. App. 1989), remanded on other grounds, 585 So. 2d 112 (Ala. 1991), aff'd on return to remand, 625 So. 2d 1141 (Ala. Crim. App. 1992), rev'd, 625 So. 2d 1146 (Ala. 1993), quoting Magwood v. State, 494 So. 2d 124, 141 (Ala. Crim. App. 1985), aff'd, 494 So. 2d 154 (Ala. 1986). 'Photographic exhibits are admissible even though they may be cumulative, demonstrative of undisputed facts, or gruesome.' Williams v. State, 506 So. 2d 368, 371 (Ala. Crim. App. 1986) (citations omitted). In addition, 'photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.' Ex parte Siebert, 555 So. 2d 780, 784 (Ala. 1989). 'This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim's injuries.' Ferguson v. State, 814 So. 2d 925, 944 (Ala. Crim. App. 2000), aff'd, 814 So. 2d 970 (Ala. 2001). '"[A]utopsy

28

photographs depicting the character and location of wounds on a victim's body are admissible even if they are gruesome, cumulative, or relate to an undisputed matter."' Jackson v. State, 791 So. 2d 979, 1016 (Ala. Crim. App. 2000), quoting Perkins v. State, 808 So. 2d 1041, 1108 (Ala. Crim. App. 1999), aff''d, 808 So. 2d 1143 (Ala. 2001), judgment vacated on other grounds, 536 U.S. 953, 122 S. Ct. 2653, 153 L. Ed. 2d 830 (2002), on remand to, 851 So. 2d 453 (Ala. 2002). 'The same rule applies for videotapes as for photographs: "The fact that a photograph is gruesome and ghastly is no reason for excluding it, if relevant, even if the photograph may tend to inflame the jury."' Siebert v. State, 562 So. 2d 586, 599 (Ala. Crim. App. 1989), aff'd, 562 So. 2d 600 (Ala. 1990), quoting Walker v. State, 416 So. 2d 1083, 1090 (Ala. Crim. App. 1982). See also Ward v. State, 814 So. 2d 899 (Ala. Crim. App. 2000). Generally, '[a] properly authenticated video tape recording of the scene of the crime constitutes competent evidence' and 'is admissible over the defendant's objections that the tape was inflammatory, prejudicial, and cumulative.' Kuenzel v. State, 577 So. 2d 474, 512-13 (Ala. Crim. App. 1990), aff'd, 577 So. 2d 531 (Ala. 1991). 'Provided that a proper foundation is laid, the admissibility of videotape evidence in a criminal trial is a matter within the sound discretion of the trial judge.' Donahoo v. State, 505 So. 2d 1067, 1071 (Ala. Crim. App. 1986)."

Brooks v. State, 973 So. 2d 380, 393 (Ala. Crim. App. 2007). Thus, this Court has upheld video evidence, that included audio, depicting the scene of a crime that "show[ed] [a] massive amount of blood present" on a victim who had been cut in the neck and depicting the finding of another victim (a 12-year-old child) that had been shot multiple times in the head. Id. at 386-87, 393-94. The evidence in Brooks was admissible because it

29

depicted the crime scene, showed the condition of the victims when they were found, and duplicated the remoteness of the location, which showed the effort put in to cover up the crime. Id. at 394.

In Luong v. State, 199 So. 3d 173, 183 (Ala. Crim. App. 2015), Luong "was convicted of five counts of murder made capital because he killed his four children, all under the age of 14 years, by one act or pursuant to one scheme or course of conduct." Luong confessed to killing his children by throwing them off a bridge, and the children died due to "blunt-force trauma and asphyxia due to drowning." Id. Regardless, this Court found that the State had the burden of proving that its victims were deceased, and photographs or video evidence were direct proof on that point. Id. at 211.

In Riley v. State, 166 So. 3d 705 (Ala. Crim. App. 2013), Riley was convicted of capital murder during a first-degree robbery and sentenced to death. At issue were "three surveillance videos" that "clearly depict[ed] Riley robbing" a store and leading a victim into a back room. Id. at 754. The actual murder was not captured on the videos, but "the audio portion of the videos recorded the sound of each gunshot, as well as the 'clearly audible, drawn out, agonizing "scream" of the victim….'" Id.

While this Court applied plain-error review, this Court noted that "'the balancing of probative value against prejudicial effect is a matter which is within the discretion of the trial court.'" Id. at 756 (quoting United States v. Guerrero, 667 F.2d 862, 867 (10th Cir. 1981), citing in turn United States v. Parker, 604 F.2d 1327, 1329 (10th Cir. 1979)). However, after reviewing the video evidence, this Court held that the probative value of the videos outweighed any prejudice. Id.

Finally, in State v. Abu-Fakher, 274 Kan. 584, 594, 56 P.3d 166, 175 (2002), the Kansas Supreme Court considered whether it was error to admit, over Abu-Fakher's objection, an audiotape recording that contained "the dying sounds" of the victim, which Abu-Fakher argued could have been easily redacted and only served to inflame the passions of the jury. In finding the admission of the recording appropriate, the Kansas Supreme Court found it offered "proof of the elements of the crime charged, including the fact and manner of [the victim]'s death." Id. at 176-77. More specifically, the Kansas Supreme Court found the recording "captured the demeanor of the parties involved," corroborated other evidence, and was the "most probative and comprehensive evidence of the actual commission of the crime, the sequence in which events

31

occurred, and their duration; it [also] provide[d] considerable context for the manner of death and time span in which the events took place." Id. at 177.

It is well established that

"'"Alabama recognizes a liberal test of relevancy,"' Gavin v. State, 891 So. 2d 907, 963 (Ala. Crim. App. 2003) (quoting Hayes v. State, 717 So. 2d 30, 36 (Ala. Crim. App. 1997)), which provides that evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' Rule 401, Ala. R. Evid. Under that liberal standard, evidence is '"admissible against a relevancy challenge if it has any probative value, however[] slight, upon a matter in the case."' Gavin, 891 So. 2d at 964 (quoting Knotts v. State, 686 So. 2d 431, 468 (Ala. Crim. App. 1995) (emphasis added))."

Harrison v. State, 398 So.3d 955, 969 (Ala. Crim. App. 2023). Moreover, "'"[p]hotographs [or videos] that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence."' Lindsay v. State, 326 So. 3d 1, 34 (Ala. Crim. App. 2019) (quoting Ex parte Siebert, 555 So. 2d 780, 783 (Ala. 1989) (emphasis added))." Harrison, 398 So. 3d at 970 (Ala. Crim. App. 2023).

Here, the body-camera footage, along with its audio, was relevant and probative for several reasons. The body-camera footage and its audio depicted how the crime scene appeared upon law enforcement's arrival

32

at the scene. The body-camera footage's audio showed that officers were not able to hear the burglar alarm until they proceeded to Pughsley's open back door. Once inside, the footage showed how the inside of Pughsley's home appeared upon their arrival. It also captured exactly where in the master bedroom and in what position Pughsley was found. The footage also showed where Pughsley was wounded. The audio depicted that Pughsley was still alive at the time law-enforcement officers arrived because she was moaning and could follow directions, such as breathing onto an officer's hand. However, the audio also depicted the moment that Pughsley stopped breathing and the subsequent life-saving efforts by law-enforcement officers. The entire body-camera footage is 1 hour and 19 minutes long; however, the footage depicting Pughsley is approximately 10 minutes long. Thus, this evidence was relevant and probative to show that Pughsley was alive and died due to being shot. Additionally, this evidence tended to rebut Webster's insinuation at trial that law-enforcement officers were playing some nefarious game to blame him and protect their own police members or friends.

However, our inquiry does not end with a finding that the body-camera footage was relevant. Relevant evidence may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Rule 403, Ala. R. Evid. Thus,

> "[t]he question under Rule 403[, Ala. R. Evid.,] is not simply whether [Webster] was prejudiced by the admission of [the] video; indeed 'all evidence against a defendant … [is] prejudicial.' Wilson v. State, 142 So. 3d 732, 812 (Ala. Crim. App. 2010). Rather, the question is whether there was a danger that <u>unfair</u> prejudice could result from the admission of the video and whether that danger was <u>substantially</u> outweighed by the video's probative value. See Ex parte Vincent, 770 So. 2d 92, 95 (Ala. 1999) ('Mere prejudice is not a basis for exclusion under Rule 403[, Ala. R. Evid.], because evidence can be harmful, yet not unfairly prejudicial.') As to what constitutes <u>unfair</u> prejudice, the Alabama Supreme Court has explained:
>
> > "'"Unfair prejudice" under Rule 403 has been defined as something more than simple damage to an opponent's case. Dealto v. State, 677 So. 2d 1236 (Ala. Crim. App. 1995). A litigant's case is always damaged by evidence that is contrary to his or her contention, but damage caused in that manner does not rise to the level of "unfair prejudice" and cannot alone be cause for exclusion. Jackson v. State, 674 So. 2d 1318 (Ala. Crim. App. 1993), reversed in part on other grounds, 674 So. 2d 1365 (Ala. 1994). "Prejudice is 'unfair' if [it] has 'an undue tendency to suggest decision on an improper basis.'" Gipson v. Younes, 724 So. 2d 530, 532 (Ala. Civ. App. 1998), quoting Fed. R. Evid. 403 (Advisory Committee Notes 1972). See, also, Rule 403, Ala. R. Evid.'

34

"Ex parte Vincent, 770 So. 2d at 96."

Harrison v. State, 398 So.3d at 970-71.

Here, the body-camera footage's probative value is not outweighed by any prejudice. The body-camera footage depicted both Pughsley being found alive suffering from a gunshot wound and her death from that same wound. Although the footage and its accompanying audio was certainly prejudicial, as is the nature of such violent crimes, that alone does not make the evidence inadmissible. While Pughsley's gasps for breath would certainly arouse some passion, it does not rise to the level of suggesting the jury would make its decision on an improper basis. Additionally, the body-camera footage also refuted Webster's insinuation throughout the trial that law-enforcement officers were attempting to protect their own members and friends during this investigation. Given these circumstances, the trial court did not err in admitting the body-camera footage into evidence, and Webster is due no relief.

## V. Webster's Prior Statements

Webster next argues that the trial court erred when it admitted his "alleged statements … that he would shoot Pughsley in the face if he saw her" because, he says, the probative value of this evidence was

35

substantially outweighed by unfair prejudice. (Webster's brief, pp. 17-20.) This issue is both unpreserved and without merit.

Before the trial, the State provided notice that it intended to offer evidence at Webster's trial, pursuant to Rule 404(b), Ala. R. Evid., "to prove [Webster]'s intent to kill and motive to kill" Pughsley. (C. 311-12.) Specifically, the State provided notice that it intended to show that between May and June of 2020 Webster "made statements that he wanted to shoot [Pughsley] in the face and that if he saw [Pughsley] downtown he would shoot her in the face." (C. 311.) At a hearing before the trial began, Webster objected to the admission of this evidence, arguing that its probative value was substantially outweighed by unfair prejudice. Webster argued that the alleged threatening statements were conveyed to a third party, Ashley Hartley, and not to Pughsley. Finally, Webster also argued that the threats were irrelevant because Pughsley was neither shot in the face nor was she downtown when she was shot. The trial court classified Webster's pretrial objection as a motion in limine and denied his motion.

Hartley, in July 2020, was a patrol officer with the Montgomery Police Department; however, at the time of Webster's trial, she was no

longer with the Montgomery Police Department. Hartley knew Pughsley was also with the Montgomery Police Department and knew Pughsley was dating Webster because she is friends with Webster's sister, Tatyana. When asked whether Webster had stated that he wanted to shoot Pughsley in the face, as was written in Hartley's statement, Hartley stated: "I didn't put that in my statement." (R. 598.) Hartley also denied putting in her statement that Webster had stated that he hated Pughsley or that Webster said he would shoot Pughsley in the face if he saw her downtown. On cross-examination, Webster's counsel inquired into Hartley testifying that she did not write in her statement -- even though it appears in the statement -- that Webster had threatened to shoot Pughsley in the face or that Webster hated Pughsley. Hartley denied having ever heard Webster say that he wanted to shoot Pughsley in the face. On redirect examination, Hartley twice denied putting in her statement that Webster had threatened to shoot Pughsley in the face.

This issue was not preserved for appellate review. Regarding preservation of an issue raised in a motion in limine, this Court has stated:

> "'"The general rule is that an adverse ruling on a motion in limine does not preserve the issue for

> appellate review unless an objection is made at the time the evidence is introduced." Moody v. State, 888 So. 2d 532, 582 (Ala. Crim. App. 2003). "[U]nless the trial court's ruling on the motion in limine is absolute or unconditional, the ruling does not preserve the issue for appeal." Perry v. Brakefield, 534 So. 2d 602, 606 (Ala. 1988).'

> "Saunders v. State, 10 So. 3d 53, 87 (Ala. Crim. App. 2007). See also Parks v. State, 587 So. 2d 1012, 1015 (Ala. 1991) (holding where a party seeking the exclusion of the evidence suffers an adverse ruling on its motion in limine, that party can preserve the ruling for appellate review 'only by objecting to the introduction of the proffered evidence and assigning specific grounds at the time of trial, unless he or she obtains the express acquiescence of the trial judge that a subsequent objection and assignment of grounds are not necessary')."

Lucas v. State, 204 So. 3d 929, 941-42 (Ala. Crim. App. 2016). Here, Webster argued to the trial court, before opening statements, that Hartley's alleged Rule 404(b), Ala. R. Evid., evidence should be excluded from the trial. After hearing the arguments, the trial court denied Webster's motion, but there is no indication that this ruling was absolute or unconditional. In fact, the trial court indicated that it was open to changing its ruling when it denied the motion "at th[at] time." (R. 197.) During the trial, Webster did not object when Hartley was called, nor did Webster interpose any objection when Hartley was asked about the

proffered Rule 404(b) evidence. Thus, Webster failed to preserve this issue for appellate review.

Even if Webster had preserved the issue, Webster would not be entitled to relief. During the State's questioning of Hartley, Hartley adamantly denied that she ever wrote that Webster had threatened to shoot Pughsley in the face. While the State insinuated that Hartley's statement contained this claim, Hartley denied writing it, and the State did not put Hartley's statement into evidence. Thus, there was no evidence introduced at Webster's trial that Webster had previously said that he wanted to shoot Pughsley in the face. See Bates v. State, 669 So. 2d 232, 235 (Ala. Crim. App. 1995) (holding that statements of attorneys in a trial are not evidence); see also Armstrong v. State, 516 So. 2d 806, 809 (Ala. Crim. App. 1986) ("The prosecutor's statements are not evidence."). The fact that the evidence at issue was not introduced into evidence at Webster's trial makes this issue moot. See Irwin v. Jefferson Cnty. Pers. Bd., 263 So. 3d 698, 703 (Ala. 2018) (finding that a moot question is one as to which no real controversy exists, such as a question that seeks to answer an abstract question based on nonexistent facts or rights). Webster is, thus, due no relief.

## VI.   Jury Instruction on Intent

Webster finally argues that the trial court erred when it improperly instructed the jury that it could "presume" intent.  (Webster's brief, p. 20-22.)  Relying in part upon <u>Sandstrom v. Montana</u>, 442 U.S. 510 (1979), Webster argues that the trial court's instruction on intent improperly shifted the burden to him.  Webster concedes in his brief that no objection was made to this instruction in the trial court, but he again requests plain-error review.

This issue was not preserved for appellate review, and, as already noted, the plain-error doctrine does not apply because the death penalty was not imposed.  This Court has repeatedly held that "[p]lain error review does not apply to convictions in which the death penalty has not been imposed." <u>Hicks</u>, 378 So. 3d at 1130.  Moreover,

> "'"[r]eview on appeal is restricted to questions and issues properly and timely raised at trial."'  <u>Ex parte Coulliette</u>, 857 So. 2d 793, 794 (Ala. 2003) (citing <u>Newsome v. State</u>, 570 So. 2d 703, 717 (Ala. Crim. App. 1989). ...  '[T]o preserve an issue for appellate review, it must be presented to the trial court by a timely and specific motion setting out the specific grounds in support thereof.' <u>McKinney v. State</u>, 654 So. 2d 95, 99 (Ala. Crim. App. 1995) (citation omitted).
>
> "Rule 21.3, Ala. R. Crim. P., provides, in pertinent part:

40

> "'No party may assign as error the court's giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection.'"

Jones v. State, 217 So. 3d 947, 960-61 (Ala. Crim. App. 2016).

Here, as Webster concedes, he did not object to the trial court's jury instruction on the ground he advances on appeal. Because Webster failed to object to the trial court's instruction, this issue is not preserved for appellate review. Webster is, thus, due no relief.

## VII. Illegal Sentence

Webster's three convictions and his sentences for capital murder while a valid protective order was in place and capital murder during a first-degree burglary are proper. However, even though neither Webster nor the State challenges Webster's 10-year "straight" sentence for attempted first-degree assault, we must take notice that Webster's 10-year sentence is illegal. "It is well settled that '[m]atters concerning unauthorized sentences are jurisdictional.' Hunt v. State, 659 So. 2d 998, 999 (Ala. Crim. App. 1994). Therefore, this Court may take notice of an illegal sentence 'at any time and may do so even ex mero motu.' Moore

41

v. State, 40 So. 3d 750, 753 (Ala. Crim. App. 2009)." Towns v. State, 293

So. 3d 975, 985 (Ala. Crim. App. 2019).

First-degree assault, § 13A-6-20, Ala. Code 1975, is classified as a

Class B felony. However, an attempt to commit a first-degree assault is

classified as Class C felony. § 13A-4-2(d)(3), Ala. Code 1975. A Class C

felony is punishable by imprisonment for "not more than 10 years or less

than one year and one day." § 13A-5-6(a)(3), Ala. Code 1975. However,

> "'"[a] defendant's sentence is determined by the law in effect
> at the time of the commission of the offense."' Moore [v.
> State], 40 So. 3d [750,] 753 [(Ala. Crim. App. 2009)] (quoting
> Davis v. State, 571 So. 2d 1287, 1289 (Ala. Crim. App. 1990)).
> See also Minnifield v. State, 941 So. 2d 1000, 1001 (Ala. Crim.
> App. 2005) ('It is well settled that the law in effect at the time
> of the commission of the offense controls the prosecution.')."

Towns, 293 So. 3d at 986. At the time of Webster's offenses, on July 6,

2020, § 15-18-8(b), Ala. Code 1975, stated, in pertinent part:

> "[W]hen a defendant is convicted of an offense that constitutes
> a Class C or D felony offense and receives a sentence of not
> more than 15 years, the judge presiding over the case shall
> order that the convicted defendant be confined in a prison,
> jail-type institution, treatment institution, or community
> corrections program for a Class C felony offense … for a period
> not exceeding two years in cases where the imposed sentence
> is not more than 15 years, and that the execution of the
> remainder of the sentence be suspended notwithstanding any
> provision of the law to the contrary and that the defendant be
> placed on probation for a period not exceeding three years and
> upon such terms as the court deems best."

42

Webster was not sentenced pursuant to the Habitual Felony Offender Act, § 13A-5-9, Ala. Code 1975. Thus, Alabama law required that Webster's 10-year "straight" sentence for a Class C felony conviction be split for him to serve a period of no more than 2 years' imprisonment followed by a period of probation for no more than 3 years. Although the Alabama Legislature has amended § 15-18-8(b) since the commission of Webster's crimes, Webster's sentence must comply with the law in effect at the time of the offense or it is an illegal sentence. Because the execution of Webster's 10-year sentence is illegal, we must remand this case to the trial court for it to impose a sentence on Webster for his conviction for attempted first-degree assault that complies with the version of § 15-18-8(b), Ala. Code 1975, in effect at the time of the offense. Because Webster's 10-year sentence is valid, the trial court cannot change the base sentence. See Born v. State, 331 So. 3d 626, 638 (Ala. Crim. App. 2020).

## Conclusion

For these reasons, Webster's convictions for capital murder while a protective order was in place and for capital murder during a first-degree burglary and the resulting concurrent sentences of life imprisonment

43

without the possibility of parole are affirmed. Webster's conviction for attempted first-degree assault is also affirmed. However, this case is remanded to the trial court for that court to resentence Webster in accordance with this opinion for his attempted-first-degree-assault conviction. Due return shall be made to this Court within 42 days of the date of this opinion.

AFFIRMED IN PART; REMANDED WITH INSTRUCTIONS.

Windom, P.J., and Minor and Anderson, JJ., concur. Kellum, J., concurs in the result.